JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SYCAMORE PETROLEUM-KC OIL, LLC, et al.

## DEFENDANTS
KC OIL, INC., et al.

**(b)** County of Residence of First Listed Plaintiff   Chester, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Mercer, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pepper Hamilton LLP, Francis J. Lawall & John L. Schweder, II
3000 Two Logan Sq., 18th & Sts., Philadelphia, PA 19103
215.981.4000

Attorneys *(If Known)*
Lewis & Forrey, LLC, David F. Forrey
15 Chambers St.
Princeton, NJ 08542

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question  *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                           *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)(1)
Brief description of cause:
Defendants breached the representation and warranty provision of written contracts, which damaged plaintiffs.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE
DOCKET NUMBER

DATE
01/28/2015

SIGNATURE OF ATTORNEY OF RECORD
/s/ John L. Schweder, II; Pepper Hamilton LLP

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

JS 44 Reverse  (Rev. 12/12)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III.   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.**  Place an "X" in one of the six boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

VII.   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| SYCAMORE PETROLEUM-KC OIL, LLC et al. | : : | CIVIL ACTION |
| v. | : | |
| KC OIL, INC. et al. | : : : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.           ( X )

| | | |
|---|---|---|
| January 28, 2015 | Pepper Hamilton LLP John L. Schweder, II | Plaintiffs Sycamore Petroleum-KC OIL, LLC, et al. |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215.981.4170 | 800.259.7739 | schwedej@pepperlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)      The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)      In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)      The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)      Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)      Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

## SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Sycamore Petroleum-KC OIL, LLC, 998 Old Eagle School Rd., Ste. 1250, Wayne, PA

Address of Defendant: KC Oil, Inc., 1 Union St., Ste. 208, Robbinsville, NJ

Place of Accident, Incident or Transaction: Breach of Contract with Pennsylvania forum selection provision

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☒

Does this case involve multidistrict litigation possibilities?   Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, John L. Schweder, II _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: January 28, 2015     Pepper Hamilton LLP
John L. Schweder, II                              208595
Attorney-at-Law                                 Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

Pepper Hamilton LLP

DATE: January 28, 2015     John L. Schweder, II                    208595
Attorney-at-Law                                 Attorney I.D.#

CIV. 609 (5/2012)

**UNITED STATES DISTRICT COURT**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Sycamore Petroleum-KC OIL, LLC, 998 Old Eagle School Rd., Ste. 1250, Wayne, PA

Address of Defendant: KC Oil, Inc., 1 Union St., Ste. 208, Robbinsville, NJ

Place of Accident, Incident or Transaction: Breach of Contract with Pennsylvania forum selection provision

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes☐  No☒

Does this case involve multidistrict litigation possibilities?  Yes☐  No☒

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?  Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
 (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
 (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, John L. Schweder, II _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: January 28, 2015

Pepper Hamilton LLP
John L. Schweder, II          208595
Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: January 28, 2015

Pepper Hamilton LLP
John L. Schweder, II          208595
Attorney-at-Law            Attorney I.D.#

CIV. 609 (5/2012)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SYCAMORE PETROLEUM-KC OIL, LLC, SYCAMORE ENERGY-KC OIL, LLC and STERLING FUELS & LOGISTICS, LLC | : : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : : | No._____ |
| KC OIL, INC., GREENWOOD ENTERPRISES, INC., BUCKS COUNTY PETROLEUM LLC, TRENTON PETROLEUM INC., CREIGHTON FAMILY PROPERTIES, LP, JAN CREIGHTON and KIMBERLY CREIGHTON | : : : : : : : | JURY TRIAL DEMANDED |
| Defendants. | : : | |

## COMPLAINT

Plaintiffs Sycamore Petroleum-KC Oil, LLC, Sycamore Energy-KC Oil, LLC and

Sterling Fuels & Logistics, LLC (successor by merger to both Sycamore Petroleum, LLC and

Sycamore Energy, LLC) (collectively, "Sycamore") files this complaint against Defendants KC

Oil, Inc., Greenwood Enterprises, Inc., Bucks County Petroleum LLC, Trenton Petroleum Inc.,

Creighton Family Properties, LP, Jan Creighton, and Kimberly Creighton (collectively,

"Defendants" or "Sellers"), and allege as follows:

## NATURE OF THE CASE

1.      Pursuant to the terms of two asset purchase agreements, Sycamore

purchased from Sellers certain real and personal property assets, including twelve (12) property

locations engaged in the sale of petroleum, as well as Sellers' heating oil business.

2.      A critical component of that transaction was a representation by Sellers

with respect to the historical volume of products sold by the Sellers in the year prior to closing.

3.      Sellers represented and warranted in the asset purchase agreements and closing certificates that the historical volume of products sold from January 2011 through November 2011 was accurate and complete.

4.      After the transaction closed, Sycamore determined that Sellers misrepresented the historical volume of products sold.

5.      Sellers overstated the volume of petroleum products sold by approximately 2,700,000 gallons and the volume of heating oil, diesel, and kerosene product sold by more than 70%.

6.      The misrepresentations inflated the value of the transaction by at least $2,900,000.

7.      As direct result of Sellers' breach of the asset purchase agreements and closing certificate, Sycamore has been damaged in an amount equal to what it overpaid for the assets, the lost profits on what Sycamore would have earned had the historical volume representations been accurate, and interest payments paid to lenders and under certain promissory notes.

8.      Sycamore brings this civil action against Sellers for breach of contract.

**THE PARTIES**

9.      Plaintiff Sycamore Petroleum-KC Oil, LLC is a Pennsylvania limited liability company with a principal place of business at 998 Old Eagle School Road, Suite 1205, Wayne, Pennsylvania.  Sycamore Petroleum-KC Oil, LLC acquired the assets that were purchased from Sellers under the Petroleum Agreement and described more fully below.

10.      Plaintiff Sycamore Energy-KC Oil, LLC is a Pennsylvania limited liability company with a principal place of business at 998 Old Eagle School Road, Suite 1205, Wayne,

-2-

Pennsylvania. Sycamore Energy-KC Oil, LLC acquired the assets that were purchased from Sellers under the Tank Wagon Delivery Agreement and described more fully below.

11.     Plaintiff Sterling Fuels & Logistics, LLC is a Pennsylvania limited liability company at 998 Old Eagle School Road, Suite 1205, Wayne, Pennsylvania. Sterling Fuels & Logistics, LLC is the successor by merger to both Sycamore Petroleum, LLC and Sycamore Energy, LLC.

12.     Defendant KC Oil, Inc. is New Jersey corporation with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

13.     Defendant Greenwood Enterprises, Inc. is New Jersey corporation with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

14.     Defendant Bucks County Petroleum LLC is either a New Jersey or Florida single-member limited liability company with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

15.     Defendant Trenton Petroleum Inc. is a New Jersey corporation with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

16.     Defendant Creighton Family Properties, LP is either a New Jersey or Florida limited partnership with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

17.     Defendant Jan Creighton is an adult individual and resident of the State of Florida with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

18.     Defendant Kimberly Creighton is an adult individual and resident of the State of Florida with an address at 11056 Harbour Yacht Court, Unit 202, Fort Myers, Florida 33908.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     The Court has personal jurisdiction over the parties who consented to jurisdiction in the United States District Court for the Eastern District of Pennsylvania under section 8.11 of the Asset Purchase Agreements.  The Court also has personal jurisdiction over Sellers who conducted business in Pennsylvania, and sold or shipped product into Pennsylvania.

21.     Venue is proper in this district because the parties consented to venue in the United States District Court for the Eastern District of Pennsylvania under section 8.11 of the Asset Purchase Agreements.

## FACTUAL ALLEGATIONS

### Petroleum Agreement

22.     On or about November 14, 2011, Sycamore and Sellers entered into an Asset Purchase Agreement ("Petroleum Agreement"), the terms of which provided for the sale by Sellers to Sycamore of ten (10) fee real property locations and the assignment of two (2) leasehold property locations (the "Properties"), as well as other assets.

23.     A true and correct copy of the Petroleum Agreement is attached as Exhibit A.

24.     The purchase price for the assets was $8,000,000, plus the value of the fuel inventory calculated on the date of closing.  Ex. A. at § 2.1

25.     At closing, Sycamore paid Sellers $7,250,00 in cash and gave Sellers a promissory note in the amount of $750,000 payable over ten (10) years at six percent interest. *Id.* at 2.3.

26.     A key component of the transaction and purchase price was the historical volume of petroleum products sold by Sellers at the Properties in the year prior to closing.

27.     Accordingly, at Section 5.2(s) of the Agreement, Sellers represented and warranted that "[t]he sales figures and volume history for each of the Properties furnished by Seller to Buyer are accurate and complete." *Id.* at § 5.2(s).

28.     The Agreement further provides that "[t]he representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing." *Id.* at § 7.2(a).

29.     On January 20, 2012, Sellers provide Sycamore with their year-to-date volume data from January 2011 through November 2011. *See* Jan. 20, 2012 email, a true and correct copy is attached as Exhibit B.

30.     Sellers represented and warranted that the volume of petroleum products sold from January 2011 through November 2011 was approximately 8,343,015 gallons.

31.     On January 30, 2012, the parties closed on the transaction.

32.     Subsequent to closing, Sycamore determined that the historical volume represented and warranted by Sellers was grossly inaccurate.

33.     An audit of Sellers' records, including their Quick Book files, and an analysis of the actual sales and the Oil Price Information Service ("OPIS") sales price during the relevant time period, show that Sellers misrepresented the historical volume of petroleum products sold by approximately 2,700,000 gallons.

-5-

34.     Sellers' breach of the representation and warranty provisions of the Petroleum Agreement caused Sycamore to pay between $2,900,000 and $4,200,000 more for the assets than the true value of the portfolio.

35.     Sellers' breach has caused Sycamore to suffer lost profits on what Sycamore would have earned had the historical volume representation been accurate.

36.     Sellers' breach has caused Sycamore to suffer damages in the form of interest paid to lenders and on the promissory note(s) as a result of paying a higher purchase price based on Sellers' misrepresentations.

## Tank Wagon Delivery Agreement

37.     On or about November 14, 2011, Sycamore and Sellers entered into an Asset Purchase Agreement ("Tank Wagon Delivery Agreement"), the terms of which provided for the sale by Sellers to Sycamore of Seller's heating oil business, including a customer list, inventory, and other assets.

38.     A true and correct copy of the Tank Wagon Delivery Agreement is attached as Exhibit C.

39.     The purchase price for the assets was $2,000,000, plus the value of the fuel inventory calculated on the date of closing.  Ex. C. at § 2.1

40.     At closing, Sycamore gave Sellers a promissory note in the amount of $1,000,000 payable over ten (10) years at six percent interest.  *Id.* at 2.3.  Sycamore also executed promissory notes in favor of Sellers in the amounts $24,609.27, $6,028.12, and $32,339.64 of as part of this transaction.

-6-

41.     The key component of the transaction and purchase price was the historical volume of heating oil, diesel, and kerosene products sold by Sellers in the year prior to closing.

42.     Accordingly, at Section 5.2(t) of the Tank Wagon Delivery Agreement, Sellers represented and warranted that "[t]he sales figures and volume history for each of the Properties and for the Business furnished by Seller to Buyer are accurate and complete." *Id.* at § 5.2(t).

43.     The Tank Wagon Delivery Agreement further provides that "[t]he representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing." *Id.* at § 7.2(a).

44.     On January 31, 2012, the parties executed a Second Amendment to Tank Wagon Delivery Agreement that provided "[t]he Seller represents and warrants that the heating oil sales volumes depicted in the Exhibit A to this Second Amendment are true and complete." *See* Second Amendment to Tank Wagon Delivery Agreement at ¶ 1.5, a true and correct copy of is attached as Exhibit D.

45.     In Exhibit A to the Second Amendment to the Tank Wagon Delivery Agreement, Sellers represented and warranted that: (1) the heating oil volume was 709,574 gallons; (2) the off road diesel volume was 31,729 gallons; (3) the on road diesel volume was 1,260,255 gallons; and (4) the kerosene volume was 42,931 gallons. *Id.* at Ex. A.

46.     On January 31, 2012, Sellers executed a Seller's Certificate certifying that "[t]he representations and warranties made by Seller in the Agreement are true in all material

respects when made and on and as of the date hereof." *See* Seller's Certificate, a true and correct copy is attached as Exhibit E.

47.     On January 31, 2012, the parties closed on the transaction.

48.     Subsequent to closing, Sycamore determined that the historical volume represented and warranted by Sellers was grossly inaccurate.

49.     A review of Sellers' records and analysis of Sycamore's post-closing sales volumes show that Sellers inaccurately overstated the historical volume of heating oil, off road diesel, on road diesel, and kerosene products sold by at least 70%.

50.     Sellers breach of the representation and warranty provisions of the Tank Wagon Delivery Agreement, Second Amendment, and Seller's Certificate caused Sycamore to pay more for the assets than the true value of the portfolio.

51.     Sellers' breach has caused Sycamore to suffer lost profits on what Sycamore would have earned had the historical volume representation been accurate.

52.     Sellers' breach has caused Sycamore to suffer damages in the form of interest paid to lenders and on the promissory notes as a result of paying a higher purchase price based on Sellers' misrepresentations.

## COUNT I – BREACH OF CONTRACT/PETROLEUM AGREEMENT

53.     Sycamore incorporates the allegations set forth above as if fully set forth herein.

54.     Sycamore and Sellers executed the Petroleum Agreement dated as of November 14, 2011, which transaction closed on January 30, 2012.

55.     In Section 5.2 of the Agreement, Sellers represented and warranted that "[t]he sales figures and volume history for each of the Properties furnished by Seller to Buyer are accurate and complete."

56.     Sellers further agreed that "[t]he representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing."

57.     Sellers' representations regarding the historical volume of petroleum products sold between January 2011 and November 2011 was inaccurate.

58.     Sellers misrepresented the historical volume of petroleum products sold between January 2011 and November 2011, and overstated the volume by approximately 2,900,000 gallons.

59.     Sellers' misrepresentations constitute a breach of the Petroleum Agreement.

60.     As a direct result of Sellers' breach, Sycamore has been damaged in the amount equal to what it overpaid for the assets, Sycamore's lost profits, and interest paid to lenders and under the promissory notes.

WHEREFORE, Plaintiffs Sycamore Petroleum-KC Oil, LLC, Sycamore Energy-KC Oil, LLC, and Sterling Fuels & Logistics, LLC request judgment in their favor and against Defendants KC Oil, Inc., Greenwood Enterprises, Inc., Bucks County Petroleum LLC, Trenton Petroleum Inc., Creighton Family Properties, LP, Jan Creighton, and Kimberly Creighton for breach of contract, and an order granting the following relief:

a.      an award of direct and consequential damages equal to the difference between the purchase price Sycamore paid under the Petroleum and Tank Wagon Delivery Agreements and the true value of the assets had Sellers accurately represented the

historical volume of products sold between January 2011 and November 2011, which exceeds $2,900,000;

        b.     an award of direct and consequential damages equal to the lost profits that Sycamore would have earned had the historical volume representation been accurate;

        c.     an award of direct and consequential damages equal to the amount of interest payments Sycamore paid to lenders and under the promissory notes on the overstated purchase price; and

        d.     attorneys' fees, costs, and other relief the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT/TANK WAGON DELIVERY AGREEMENT

61.    Sycamore incorporates the allegations set forth above as if fully set forth herein.

62.    Sycamore and Sellers executed the Tank Wagon Delivery Agreement dated as of November 14, 2011, which transaction closed on January 31, 2012.

63.    In Section 5.2 of the Tank Wagon Delivery Agreement, Sellers represented and warranted that "[t]he sales figures and volume history for each of the Properties and for the Business furnished by Seller to Buyer are accurate and complete."

64.    Sellers further agreed that "[t]he representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing."

65.    In the Second Amendment, "[t]he Seller represents and warrants that the heating oil sales volumes depicted in the Exhibit A to this Second Amendment are true and complete."

-10-

66.     In the Seller's Certificate, Sellers certified that "[t]he representations and warranties made by Seller in the Agreement are true in all material respects when made and on and as of the date hereof."

67.     Sellers' representations regarding the historical volume of heating oil, off road diesel, on road diesel, and kerosene products sold between January 2011 and November 2011 was inaccurate.

68.     Sellers misrepresented the historical volume of heating oil, off road diesel, on road diesel, and kerosene products sold between January 2011 and November 2011, and overstated the volume by approximately 70%.

69.     Sellers' misrepresentations constitute a breach of the Tank Wagon Delivery Agreement, Second Amendment, and the Seller's Certificate.

70.     As a direct result of Sellers' breach, Sycamore has been damaged in the amount equal to what it overpaid for the assets, Sycamore's lost profits, and interest paid to lenders and under the promissory notes.

WHEREFORE, Plaintiffs Sycamore Petroleum-KC Oil, LLC, Sycamore Energy-KC Oil, LLC, and Sterling Fuels & Logistics, LLC request judgment in their favor and against Defendants KC Oil, Inc., Greenwood Enterprises, Inc., Bucks County Petroleum LLC, Trenton Petroleum Inc., Creighton Family Properties, LP, Jan Creighton, and Kimberly Creighton for breach of contract, and an order granting the following relief:

a.     an award of direct and consequential damages equal to the difference between the purchase price Sycamore paid under the Petroleum and Tank Wagon Delivery Agreements and the true value of the assets had Sellers accurately represented the

-11-

historical volume of products sold between January 2011 and November 2011, which exceeds $2,900,000;

        b.     an award of direct and consequential damages equal to the lost profits that Sycamore would have earned had the historical volume representation been accurate;

        c.     an award of direct and consequential damages equal to the amount of interest payments Sycamore paid to lenders and under the promissory notes on the overstated purchase price; and

        d.     attorneys' fees, costs, and other relief the Court deems just and proper.

## COUNT III – UNJUST ENRICHMENT

71.     Sycamore incorporates the allegations set forth above as if fully set forth herein.

72.     Sycamore purchased from Sellers the assets described in the Petroleum Agreement and the Tank Wagon Delivery Agreement for approximately $8,000,000 and $2,000,000, respectively.

73.     The purchase prices were inflated because Sellers misrepresented the historical volume of products sold, which caused Sycamore to pay higher purchase prices.

74.     Sycamore conferred a benefit on Sellers in the amount it overpaid for the assets under the Petroleum and Tank Wagon Delivery Agreements.

75.     Sellers appreciated and retained the use and benefit of the purchase-price funds that exceeded the true and accurate value of the assets had the historical volume of products sold not been misrepresented.

76.     It would be inequitable for Sellers to retain the purchase-price funds that exceeded the true and accurate value of the assets because Sellers made the misrepresentations that caused Sycamore to pay an inflated price.

77.     Sellers have therefore been unjustly enriched, and Sycamore has been damaged.

WHEREFORE, Plaintiffs Sycamore Petroleum-KC Oil, LLC, Sycamore Energy-KC Oil, LLC, and Sterling Fuels & Logistics, LLC request judgment in their favor and against Defendants KC Oil, Inc., Greenwood Enterprises, Inc., Bucks County Petroleum LLC, Trenton Petroleum Inc., Creighton Family Properties, LP, Jan Creighton, and Kimberly Creighton for breach of contract, and an order granting the following relief:

a.      an award of direct and consequential damages equal to the difference between the purchase price Sycamore paid under the Petroleum and Tank Wagon Delivery Agreements and the true value of the assets had Sellers accurately represented the historical volume of products sold between January 2011 and November 2011, which exceeds $2,900,000;

b.      an award of direct and consequential damages equal to the lost profits that Sycamore would have earned had the historical volume representation been accurate;

c.      an award of direct and consequential damages equal to the amount of interest payments Sycamore paid to lenders and under the promissory notes on the overstated purchase price; and

d.      attorneys' fees, costs, and other relief the Court deems just and proper.

## DEMAND FOR JURY

Sycamore hereby demands a trial by jury on all issues in this case.

Dated:  January 28, 2015

Respectfully submitted,

_/s/ Francis J. Lawall_ 

Francis J. Lawall
Attorney I.D. No. 43932
John L. Schweder, II
Attorney I.D. No. 208595
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Fax: (215) 981-4750
Email: lawallf@pepperlaw.com
schwederj@pepperlaw.com

_ATTORNEYS FOR PLAINTIFFS SYCAMORE PETROLEUM-KC OIL, LLC, SYCAMORE ENERGY-KC OIL, LLC, and STERLING FUELS & LOGISTICS, LLC_

# EXHIBIT A

## ASSET PURCHASE AGREEMENT
### (Twelve Sites)

**FOR AND IN CONSIDERATION** of the mutual benefits accruing and expected to accrue hereunder, this Asset Purchase Agreement ("Agreement") is entered into as of the *14th* day of November, 2011 ("Effective Date"), by and between SYCAMORE PETROLEUM, LLC, a Pennsylvania limited liability company with its principal place of business at 630 Skippack Pike, Blue Bell, PA 19422 or its designee, ("Buyer"), and KC OIL, INC., GREENWOOD ENTERPRISES INC., BUCKS COUNTY PETROLEUM LLC, TRENTON PETROLEUM INC., CREIGHTON FAMILY PROPERTIES, LLC and JAN & KIMBERLY CREIGHTON, with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691(individually and collectively the "Seller" or "Sellers"), all of whom, intending to be legally bound, hereby agree as follows:

Seller desires to sell or assign to Buyer, and Buyer desires to purchase or accept assignment from Seller, on the terms set forth herein, ten (10) fee real property locations and the assignment of two leasehold property locations (together, the fee and leasehold properties hereinafter referred to as the "Properties") more fully described in **Exhibit A**.

Accordingly, the parties, intending to be legally bound, hereby agree as follows:

1. **PURCHASE AND SALE OF ASSETS.**

    1.1 <u>Assets to be Sold</u>. Seller shall sell, transfer and assign to Buyer, at the Closing (as defined in Section 2.6 below), and Buyer shall purchase and receive, at the Closing, all right, title and interest of Seller in the following assets ("Assets"):

---

    (a)    <u>Real Property Assets</u>.

        (i)    <u>Real Property</u>. The twelve (12) fee and leased Properties listed in attached **Exhibit A** together with (A) all structures, buildings, compressors, appliances, electrical, plumbing, heating, ventilating and air conditioning machinery and of every kind, character and description appurtenant to the Properties, and all parking facilities and other improvements located on the Properties, which machinery and equipment shall be in working order at the time of the Closing; and (B) all the right, title and interest of Seller in any land lying in the bed of any public street, road or avenue opened or proposed in front of or adjoining the Properties, and all right, title and interest of Seller in and to any award made or to be made in lieu thereof and to any unpaid award for damage to the Properties by reason of a change of grade of any street, and all rights of way, privileges and appurtenances pertaining to the Properties.

    (b)    <u>Personal Property Assets</u>

    (i)    <u>Personal Property</u>. The tangible personal property, including goods, furniture, furnishings, fixtures, equipment, usable supplies and all other tangible personal property currently located on or at the Properties by Seller, as listed on attached **Exhibit B** ("Personal

Property").

(ii)    Inventory. Inventories of fuel products at the Properties, to be valued at the Closing in accordance with Section 2.3 below.

(iii)    Vehicles. Tractor trailers and tankers listed in **Exhibit C**.

(iv)    Names. The right and license for Buyer to use the names "GasCo" and all other trade names and trademarks and similar derivatives used in operation of the Properties.

(c)    Cash and Credit Card Receipts.   Seller shall be entitled to keep all cash in the drawer and to collect all credit card payments arising from all transactions at the Properties prior to the Closing; Buyer shall be entitled to keep all cash and collect all credit card payments arising from transactions at the Properties on and after the Closing date.

(d)    No Merger; No Successor in Interest. Buyer and Seller affirm that they intend this Agreement to provide the terms and conditions for the purchase and sale of certain specified assets and the assumption of several explicitly described liabilities; Buyer is not purchasing all of the Seller's assets; Buyer will not be offering employment to all of the Seller's owners and/or employees; and the parties expressly acknowledge and agree that neither this transaction nor the Agreement is intended to (i) create a merger between the parties, either by contract or operation of law, or confer "successor in interest" status on the Buyer.

---

November 9, 2011             3

1.2     <u>Conveyancing Instruments</u>. The title to the Fee Properties to be conveyed by Seller pursuant to Section 1.1 above shall be conveyed by means of bargain and sale deed with covenant against grantor's acts in the form of attached <u>**Exhibit D**</u>. The remaining Assets shall be conveyed pursuant to one or more bills of sale and assignments in the form of attached <u>Exhibit E</u>.

1.3     <u>Covenants Not to Compete</u>. At the Closing, all Sellers shall agree to be bound by the following restrictive covenants commencing at the Closing, each of which is hereby acknowledged to be fair and reasonable and each of which will be memorialized in a separate instrument to be signed by each Seller:

      (a)     <u>Covenant</u>. Sellers covenant and agree that, for the sixty (60) months commencing at the Closing, Sellers shall not sell any distillate, kerosene, diesel fuel, off road diesel, gasoline, heating oil, natural gas or electricity to (I) any customers on the Customer List; or (II) any location in the Territory or any counties adjacent to the Territory.

## 2. <u>PURCHASE PRICE AND TERMS OF PAYMENT</u>.

2.1     <u>Purchase Price</u>. The purchase price for the Assets ("Purchase Price") shall be Eight Million Dollars ($8,000,000) plus the value of the Fuel Inventory, calculated as set forth below

2.2     <u>Determination of Fuel Inventory</u>. Buyer and Seller shall (i) jointly determine the actual quantities of fuel at the twelve Properties on the day of the Closing; and (ii) jointly compute the value of the fuel inventory using the lower of Seller's delivered cost or market value as evidenced by documentation

furnished by Seller.

2.3    <u>Payment of Purchase Price</u>. At the Closing, Buyer shall pay Seller the Purchase Price as follows:

2.3.1   Seven Million Two Hundred Fifty Thousand Dollars ($7,250,000 in cash.

2.3.2   Seller shall accept a Promissory Note from Buyer in the amount of Seven Hundred Fifty Thousand Dollars ($750,000), payable in equal monthly payments of principal and interest over Ten (10) years at Six Percent (6.00%), in the form attached as **Exhibit F.** The Promissory Note shall be secured by (a) a personal guaranty from Mr. Kenneth C. Morrison, one of the Members of the Purchaser, in the form attached to the Promissory Note in **Exhibit I;** and (b) subject to the approval of Buyer's lender, a fee or leasehold mortgage on the Properties listed in **Exhibit A.**

2.4    Limited <u>Assumption of Liabilities; Disclaimer</u>.

(a)    <u>Liabilities Assumed</u>. On the date of Closing Buyer shall assume and undertake only Seller's obligations with respect to the vehicle leases and loans set forth in attached **Exhibit Gr,** and no other obligations.

(b)    <u>Liabilities Not Assumed.</u>

(i)    Buyer is not assuming, and Buyer hereby does not assume, any commitment, liability or obligation of Seller as a result of Buyer's purchase of the Properties except as expressly set forth in attached **Exhibit G.** and Buyer hereby expressly disclaims

---

responsibility for any liability not listed on **Exhibit G**.

(ii)   With respect to equipment, Buyer is acquiring only those items of equipment specifically identified in attached **Exhibit B** and is not acquiring or assuming  any obligation or liability whatsoever with respect to any underground or above-ground storage tanks and related piping or any other equipment of Seller or third parties at any locations except the equipment specifically identified in attached **Exhibit B,**  which are to be conveyed pursuant to the deeds and bills of sale as more fully set forth in Section 6 below, and Buyer hereby expressly disclaims responsibility for any liability not listed on **Exhibit B**.

2.5   <u>Closing</u>. The Closing of the transactions contemplated hereby and the transfer of the Assets ("Closing") shall occur on or before seventh calendar day following expiration of the Due Diligence Period, at the offices of Hopewell Valley Bank in Pennington, New Jersey  or at such other time and place as Seller and Buyer may agree in writing; provided, Buyer shall have the right to postpone the Closing one time by up to eight (8) days by delivery of written notice to Seller prior to the scheduled Closing date.

3.   **<u>EMPLOYEES AND BENEFITS</u>.**

3.1   <u>Employees</u>. Buyer shall have the right but not the obligation to offer employment to any or all of Seller's employees who currently work as drivers, office personnel and managers at the Properties, such employment offers being

under whatever terms and conditions that the Buyer shall deem appropriate. It shall be in the sole discretion of the affected employees or supervisory personnel to elect to accept any such offers of employment. Neither Seller nor any of its affiliate corporations shall offer employment to said employees unless Buyer does not offer them employment within 30 days following the Closing.

3.2    Benefit Plans. Buyer is not assuming any liability for any employee plans, programs, practices and arrangements, including but not limited to any employee benefit plan as that term as is defined in Section 3(s) of the Employee Retirement Income Security Act of 1974 .("Employee Plans"). Seller shall indemnify and hold Buyer harmless from any such liability arising under any Employee Plans in accordance with Section 6.8 below.

4.    **TAXES AND ALLOCATED EXPENSES.**

4.1    Payment of Excise Taxes. Seller shall collect from Buyer at the Closing, make all required reports, and pay directly to each and every taxing authority any and all taxes, fees and assessments which arise as a result of this Agreement (collectively "Excise Taxes"), to the extent that the statute imposing any such Excise Tax imposes an obligation on a buyer, user or operator to pay such taxes. Following the Closing, Seller shall have no further obligation in this regard. "Excise Taxes" shall include, without limitation, any license, registration or fees and all sales, use, excise, motor fuel, gross receipts, stamp, plus any penalties or interest thereon, which shall be levied or assessed by any

foreign, federal, state or local government or other taxing authority with respect to the Assets conveyed, assigned or transferred pursuant to this Agreement. "Excise Taxes" shall exclude income, franchise, or like taxes levied on or measured by Buyer's net income.

4.2   Property Taxes. All real estate (except transfer), ad valorem and personal property taxes and charges on any of the Assets (collectively "Property Taxes") shall be prorated between Seller and Buyer as of the date of the Closing. With regard to any special or general assessments against any of the Assets which are payable in installments, Buyer shall be responsible for all payments which fall due subsequent to the date of the Closing and Seller shall be responsible for all payments which fall due on or prior to the date of the Closing. Buyer shall account to Seller for and shall pay to Seller at the Closing, Buyer's pro rata share of any Property Taxes paid by Seller prior to the date of the Closing.

4.3   Transfer Tax. The expense and cost of all federal, state and local documentary stamp, conveyance, transfer and other taxes or charges in lieu thereof relating to the sale and conveyance of the Fee Properties shall be paid by Seller. All federal, state or local taxes, including sales taxes, relating to the sale and conveyance of the personal property hereunder shall be paid by Buyer.

4.4   Tax Liability. Except as otherwise provided herein (i) Seller shall be responsible for and pay all taxes levied or imposed upon or in connection with the conduct or operation of the Properties prior to the date of the Closing; and

(ii) Buyer shall be responsible for and pay all taxes levied or imposed upon or in connection with the conduct or operation of the Properties on and after the date of the Closing. Any interest and penalties arising in connection with taxes due under this Section 4.5 shall be the responsibility of the party required to timely file correct tax returns concerning such taxes and pay the taxes required to be paid thereunder.

4.5. Tax Filings. Seller shall be responsible for timely filing of all tax returns required by law to be filed in respect to the ownership of the properties as of the date of the Closing. All taxes indicated as due and payable on such returns shall be paid by Seller as and when required by law, except for such taxes as may be contested by Seller in good faith. Buyer shall be responsible for timely filing of all tax returns required by law to be filed in respect of the ownership and the operation of the Properties after the date of the Closing. All taxes indicated as due and payable on such returns shall be paid by Buyer as and when required by law, except for such taxes as may be contested by Buyer in good faith.

4.6 Tax Information. Each party to this Agreement shall provide the other party with access to all relevant documents, data and other information which may be required by the other party for the purpose of preparing tax returns and responding to any audit by any governmental agency. Each party to this Agreement shall cooperate with all reasonable requests of the other party made in connection with resisting or contesting the imposition of taxes.

Notwithstanding anything to the contrary in this Agreement, neither party to this Agreement shall be required at any time to disclose to the other income tax returns or other confidential tax information except to the extent required by government subpoena.

4.7   Deposits and Prepaid Expenses. Any refundable deposits, prepaid expenses, prepaid rents and similar items relating to the Assets shall be prorated between the parties at and as of the date of the Closing.

4.8   Utilities. Charges for water, gas, power, light, Internet and other utility service shall be Seller's with respect to service up to and through the date of the Closing and shall be Buyer's with respect to service after the date of the Closing.

4.9   Environmental and Underground System Testing. The cost of underground system and environmental testing done in accordance with Section 6.1, 6.2 and 6.3 below shall be allocated in accordance with Section 6.1, 6.2 and 6.3 below.

5.   REPRESENTATIONS AND WARRANTIES.

5.1   Disclosures. Information may be added to the disclosures in attached Exhibit H (see below) between the date of execution of this Agreement and the date of the Closing; *provided, however,* that if any additional disclosure materially and adversely affects Buyer's ability to own or operate the Properties, then Buyer shall have the right to terminate this Agreement.

5.2   Seller's Representations and Warranties. Seller represents and warrants that, except as disclosed by Seller in writing prior to the Closing as shown on attached Exhibit H:

(a)   Corporate Organization. Each of the corporate Sellers is a corporation duly organized, validly existing, and in good standing under the laws of the State of New Jersey and has the corporate power and authority to own its property and to carry on the its operations as now conducted, and to enter into and to carry out the terms and conditions of this Agreement.

(b)   Corporate Authorization. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on behalf of Seller. Seller is not subject to any by-law, agreement, instrument, order or decree of any court or governmental body which would prevent or prohibit, in whole or in part, consummation of the transactions contemplated by this Agreement.

(c)   No Brokers. Seller is neither a party to nor in any way obligated under any contract or outstanding claim for the payment of any broker's or finder's fee or similar agency, and no person is entitled to a commission or other compensation in connection with the origin, negotiation, execution or performance of this Agreement.

(d)   <u>Litigation or Claims</u>. There is no legal action, claim or controversy, or governmental proceeding or investigation, pending or threatened against Seller which would materially and adversely affect Buyer's ability to operate the Properties in the manner in which they are now being operated or which would materially and adversely affect the value of the Assets.

(e)   <u>Operation in Compliance with Laws</u>. The Assets are being operated in substantial compliance with all applicable laws, regulations and ordinances in all material respects.

(f)   <u>Title to Personal Property</u>. Seller has good and merchantable title to the Personal Property transferred hereunder free of liens, charges or encumbrances of any nature, except any liens to be discharged at the Closing from the proceeds of the sale.

(g)   <u>Title to the Properties</u>. Seller's interest in the Properties transferred hereunder shall be conveyed free of any rights of first refusal or other encumbrances, mortgages, liens, mechanics liens, security interests and other similar forms of financial obligations or liabilities, excepting liens for real property taxes or franchises taxes which are not yet due and payable. Seller is not in material violation of any law, regulation or ordinance relating to zoning or city planning at the Properties.

(h) <u>Collective Bargaining</u>. None of Seller's employees related to the Properties are covered under any collective bargaining agreements and there are no labor unions or pending petitions to or for labor unions representing employees of Seller employed in any capacity related to the Properties, nor are there any material grievances of employees that would materially and adversely affect the Buyer's ability to operate the Properties as they are now being operated at the Properties.

(i) <u>Good Faith, Due Diligence</u>. The representations and warranties made by Seller in this Agreement and any certificates to be furnished by Seller pursuant to this Agreement are made in good faith, and Seller has used due diligence to determine that there are no untrue or misleading statements or omissions of material facts contained therein. All of the information in the Exhibits and other material furnished by Seller to Buyer is true and complete in all material a lien against Assets, have been or will be paid by Seller.

(j) <u>Maintenance</u>. The Assets have been maintained in operable condition and repair, and all equipment at the Properties is in good working order.

(k) <u>Taxes</u>. All taxes, whether federal, state or local, which are or may become a lien against Assets, have been or will be paid by Seller.

(l) <u>Employment Contracts</u>. There are no outstanding contracts for services with officers, employees, professional persons or firms or independent

contractors to which Seller is a party which materially and adversely affects its Properties or its employees and which, as a result of the purchase contemplated by this Agreement, Buyer shall be responsible to assume.

(m)   Group Health and Pension Plans. Except the group health plan described on Exhibit G, which Buyer has agreed to assume and maintain until the Seller employees offered employment by Buyer are transferred to the Buyer's health plan, there are no plans in effect or commitments for group health insurance, group life insurance, profit-sharing, pension or retirement or any other plans or similar benefits to which any employees at the Properties may be entitled and which, as a result of the purchase contemplated by this Agreement, Buyer shall be responsible to assume.

(n)   Defaults on Contracts Assumed by Buyer. There has not occurred any material default of Seller in respect of any contract or obligation to be assumed by Buyer under this Agreement or any event which, with the lapse of time, shall become a material default under any such contract.

(o)   Compliance With Laws. Seller has complied with all applicable laws, orders and regulations of the federal, state and/or local governments or any agency thereof affecting the Properties, including but not limited to the provisions thereof relating to wages, hours, collective bargaining and the payment of social security and unemployment taxes, and Buyer is not liable for any arrears of wages or any tax, damage or penalties

for failure to comply with any of the foregoing.

(p)    Execution and Delivery. The execution and delivery of this Agreement, and the consummation of the transactions herein contemplated, shall not conflict with, or result in the breach of, or accelerate the performance required by, any terms of any agreement to which Seller is a party or constitute a default thereunder, or result in the creation of any lien, charge or encumbrance on the Properties or any of the Assets.

(q)    Operations and Maintenance of Assets Prior to Closing. After the Effective Date and prior to the Closing, Seller shall use and maintain the Properties in substantially the same manner in which they have been used and maintained prior to the date hereof, with a view toward maintaining such Properties on at least as high a level as enjoyed on the date hereof. Seller shall use all reasonable efforts to preserve existing relations with the employees, suppliers and customers associated with the Properties. Seller shall not materially alter the assets or remove any improvements, equipment or properties which comprise the assets, with the exception of items sold, transferred, disposed of or consumed in the ordinary course of business, without the written consent of Buyer. Seller shall promptly notify Buyer of any material matter affecting the Properties which arises from the date of this Agreement to the date of the Closing.

(r)   Insurance.   Seller has maintained, and will continue to maintain through the Closing, adequate insurance for the operation of the Properties, and such insurance coverage will remain in place for claims arising after the Closing for events occurring on or at the Properties on or prior to the Closing.

(s)   Sales and Volumes.   The sales figures and volume history for each of the Properties furnished by Seller to Buyer are accurate and complete.

5.3   Buyer's Representations and Warranties. Buyer represents and warrants:

(a)   Corporate Organization. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the Commonwealth of Pennsylvania, and has the corporate power and authority to own its property and to carry on its business as now conducted and to enter into, and to carry out the terms and conditions of this Agreement.

(b)   Corporate Authorization. The execution and delivery of this Agreement and the consummation the transactions contemplated hereby have been duly authorized by all necessary corporate action on behalf of Buyer. Buyer is not subject to any charter, by-law, agreement, instrument, order or decree of any court or governmental body which would prevent consummation of the transactions contemplated by this Agreement.

(c)   Broker. Except for AKG Consultants, LLC a broker engaged by Buyer

and whose fee shall be the responsibility of Buyer, the Buyer is not a party to, is not in any way obligated under, and has no knowledge of any contract or outstanding claim for the payment of any broker's or finder's fee in connection with the origin, negotiation, execution or performance of this Agreement.

6.   **DUE DILLIGENCE, ENVIRONMENTAL INVESTIGATION AND OTHER ADDITIONAL COVENANTS.**

    6.1   Environmental Definitions.

        (a)   Environmental Liability. "Environmental Liability" refers to any causes of action, fine, penalty, claim, demand, action, proceeding, liability, damage, loss or expense (including reasonable attorney fees) with respect to (i) the generation, recycling, processing, handling, presence, transportation, storage, treatment, or disposal of any "contaminant", as said quoted term is defined below; (ii) the release, emission, or discharge to surface soils, subsurface soils, surface waters or groundwater, including the release from the underground or above ground storage system (including products lines) or into air of any contaminant; (iii) exposure of any persons to contaminants; or (iv) any violation of any environmental law, ordinance, rule or regulation or cost recovery under any other law, regulation or order.

        (b)   Remediating the Assets. "Remediating the Assets" refers to all efforts to cleanup On-Site Contamination and Off-Site Contamination to applicable state and federal regulatory levels as required by state and

federal regulatory agencies which may include, but not be limited to, free product recovery, clean-up of dissolved hydrocarbons, soil and water treatment or removal, equipment purchase and rental, well drilling, permit and license fees, laboratory analysis, contractor and sub-contractor costs (excluding reasonable attorneys' fees and costs of Buyer's or Seller's employees), preparation of any plans, documents or filing required by regulatory agencies, groundwater treatment monitoring costs and landfill and other costs for proper disposal or treatment of contaminated water and soil and transportation costs.

(c)  Contaminant. "Contaminant" means (i)" "hazardous substances" as defined by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et. seq.; (ii) "hazardous waste" as defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. 6901 et. seq.; or (iii) "non-hazardous" substances, materials, wastes, products, pollutants, chemicals or raw materials that are subject to regulation as of the date of the Closing and require monitoring, investigation and/or remediation by the appropriate governmental agency.

(d)  On-Site Contamination. "On-Site Contamination" means contamination within the legal boundaries of the Properties in surface soils, subsurface soils, surface waters or groundwater.

(e)  Off-Site Contamination. "Off-Site Contamination" means

contamination outside the legal boundaries of the Properties that is present because of the migration of any contaminant from the Properties.

6.2    Environmental Tests and Inspections.

(a)    Environmental Assessment. Prior to the Closing, Buyer shall exercise its best efforts to complete an Environmental Assessment of the Properties. If the Environmental Assessment is not completed prior to the Closing, Buyer may elect to close on the transaction but continue the Environmental Assessment after the Closing, whereupon the results shall be presented to Seller. If the Seller in good faith does not agree with the Environmental Assessment, the Buyer's and Seller's consultants shall meet and mutually agree on the findings of the Environmental Consultant. The Environmental Assessment shall include, where necessary, the drilling and development of observation wells (or soil borings only where groundwater is not encountered) and review of existing samples, analytical results and other files and records. Buyer shall bear the costs of all tests and inspections that it elects to conduct pursuant to this Section 6.2(a). Copies of the written results of the Environmental Assessment shall be promptly forwarded to Seller, and Buyer shall formulate and submit all reports required by law regarding contamination discovered by the Environmental Assessment in accordance with the reporting requirements of

regulatory agencies, including a copy to Seller, and in all events prior to the Closing or sooner if the regulations so require. If Seller's Environmental Assessment suggests the presence of Off-Site Contamination, Seller shall, within one year following the Closing, conduct an assessment to identify the existence and extent of such contamination and to fully delineate the extent of such contamination.

(b) <u>Tanks</u>. Within two weeks prior to the Closing, Seller shall have the right, in its sole discretion, to decide whether to (i) arrange for (X) Seller and Buyer jointly to visually inspect all the above ground tanks, if any, and for (Y) Buyer to perform line testing and sticking of the tanks for interstitial contamination or leaks on all underground tanks located at the Properties at Buyer's expense, which results shall immediately be submitted to Seller; or (ii) accept Seller's most recent tank and line inspection results, copies of which have been furnished by Seller to Buyer. The test procedure used shall be mutually agreed to by the parties on gasoline tanks and waste oil or heating oil tanks, if any, to be acquired. Buyer shall promptly furnish Seller with copies of all system integrity test reports. Tests shall identify whether a defect is in a tank or line. In the event a line or tank fails testing, Seller shall correct such defect and any other defects until such line or tanks pass such test. In the event a tank or line does not test or retest tight, the cost of labor and materials associated with the repair or replacement of

individual underground tanks and lines that fail testing and any associated treatment or disposal of contaminated soil and water associated with the tank or line removal shall be assumed by Seller, and all replacements shall be of lines or tanks as required under current federal, state or local underground storage tank regulations.

(c)     Legal Compliance in Investigation and Remediation. If Buyer or Seller does not materially comply with the law in conducting the investigation and remediation of Assets, Buyer or Seller, as the case may be, shall be entitled to notify the other party in writing of the shortcoming, and such other party shall have sixty (60) days in which to comply, unless an agency with jurisdiction orders such party to comply within a shorter deadline in which case such shorter deadlines shall apply.

6.3     Environmental Liability.

(a)     Retention by Seller. Subject to the limitations set forth in this Agreement, Seller shall retain all liability and risk related to the Environmental Liability, directly or indirectly arising out of or related to the Assets and existing or occurring on or prior to the Closing. This provision with respect to Environmental Liability constitutes a fundamental part of the bargain between Seller and Buyer.

(b)     Seller's Responsibilities. Seller shall be responsible for:

(i) Abandoned underground storage tanks discovered by the Buyer that

require closure, removal and/or remediation and floor drains discovered that require closure and cleaning.

(ii) The costs associated with the treatment, proper removal, transportation and/or disposal or bio treatment of contaminated soil and groundwater existing on or prior to the Closing at the Properties.

(iii) The costs of remediation of any Contaminants to applicable state or federal regulatory standards or for any diminution in value of any properties other than the Properties arising from the presence of Off-Site Contamination if the Contaminants have been identified in the Baseline Data as defined below and if the Contaminants are attributable to the operation of the Properties prior to the Closing or it is established that Seller withheld material facts regarding contamination occurring during Seller's period of ownership. In determining whether the Contaminants are attributable to the operation of the Properties prior to the Closing, there shall be a rebuttable presumption that Contaminants first detected within two (2) years after the Closing date are attributable to the operation of Properties prior to the Closing, and that Contaminants first detected more than two (2) years after the Closing date are not attributable to the operation of the Properties prior to the Closing. The presumption that the Contaminants are attributable to the operation of the Properties prior to the Closing may be successfully rebutted by a determination, by a preponderance of the evidence, by a third party consultant engaged by

Seller, that the Contaminants are not attributable to the operation of the Properties prior to the Closing date. Similarly, the presumption that the Contaminants are not attributable to the operation of the Properties prior to the Closing may be successfully rebutted by a determination, by a preponderance of the evidence, by a third party consultant engaged by Buyer, that the Contaminants are attributable to the operation of the Properties prior to the Closing date. The method of selection of the environmental consultant will be as follows: If Seller wishes to rebut the rebuttable presumption, Seller may engage a consultant of its choice; if Buyer wishes to rebut the rebuttable presumption, Buyer may engage a consultant of its choice.

(c)     Seller's Indemnification of Buyer. Subject to the limitations contained herein Seller shall defend, indemnify and hold harmless Buyer from any Environmental Liability arising from or relating to an environmental condition existing or occurring on or prior to the Closing; *provided, however,* that Buyer shall notify Seller and seek input from Seller before incurring any expenses arising from any Environmental Liability except in the event of an emergency.

(i)     If Seller fails to discharge any or all of its environmental responsibilities under this Section 6.3, and if such failure continues for more than twenty (20) calendar days following written notice from Buyer to Seller, Buyer shall have the right, but not the obligation, to complete

Seller's environmental responsibilities until they are fully discharged.

(ii)   If Buyer exercises its right to assume part or all of Seller's environmental responsibilities under this Section 6.3, Buyer shall be entitled to be reimbursed by Seller for any and all expenses incurred by Buyer in the performance of such responsibilities.

(iii)   Buyer shall have the right to collect such reimbursement by deducting the corresponding amounts from the monthly payments otherwise due to be paid to Seller under the terms of the Promissory Note referenced in Section 2.3 and set forth in **Exhibit F**.

(d)   Buyer Responsibility. Subject to the limitations set forth in this Agreement, Buyer shall be responsible for all liability and risk related to the Environmental Liability, directly or indirectly arising out of or related to the Assets and occurring after the Closing. This provision with respect to Environmental Liability constitutes a fundamental part of the bargain between Seller and Buyer.

(e)   Buyer's Indemnification of Seller. Subject to the limitations contained herein Buyer shall defend, indemnify, and hold harmless Seller from all claims, causes, of action, fines, penalties, losses, liabilities and expenses (including reasonable legal fees) which Seller may suffer because of the presence of Contaminants arising during Buyer's ownership or operation of the Assets after the Closing as indicated by the Baseline Data as defined below.

November 9, 2011                                    24

(f)  Commingling. If, following the Closing date and while Seller is Remediating the Assets pursuant to Section 6.1 (b), there is a spill, leak or release or a suspected spill, leak or release ("New Release") of a Contaminant which impacts the Seller's remediation, Seller shall have no responsibility for the New Release. If there is a New Release, Buyer and Seller will mutually agree on an environmental consultant to make a determination as to (i) whether there is a New Release; (ii) if there is a New Release, the type and quantity of Contaminants resulting from the New Release; and (iii) the increase in the cost of remediation due to the New Release. Buyer will assume the additional cost, responsibility and liability for the reporting requirements, emergency response actions, investigation and remediation of Contaminants in excess of the "Baseline Data" as set forth below. All reporting requirements, emergency response actions, investigation, monitoring or remediation of the New Release where it has not impacted Seller's remediation shall be the sole responsibility of the Buyer. If the New Release has impacted Seller's remediation, Buyer shall be responsible for any Contaminants above the Baseline Data and/or Seller's most recent available soil and groundwater analytical results. If the New Release represents less than 50% of the Contaminants present, as determined by the consultant, Seller shall have responsibility for the remediation of the New Release and Buyer shall reimburse Seller for its allocable

share of the remediation costs. If the New Release represents greater than 50% of the Contaminants present, as determined by the consultant, Buyer shall assume responsibility for the remediation and have Seller reimburse Buyer for its allocable share of the remediation costs. Seller as set forth in the preceding sentence, or turning the remediation over to the Buyer and reimbursing the Buyer for only its allocable share of the remediation costs. In the event of any New Release which impacts Seller's remediation, Buyer shall have full responsibility for all reporting requirements, emergency response actions and investigation of the New Release. Both Buyer and Seller agree to reimburse the other party for their respective allocable share of remediation costs within thirty (30) days of receipt of copies of original invoices for such costs.

(g)   "Baseline Data" means the Contaminants and their concentrations identified in the Environmental Assessment Report to be prepared pursuant to Paragraph 6.2 (a) of this Agreement.

6.4   <u>Real Property Title Review.</u>

(a)   <u>Title Insurance Commitments.</u> Within thirty (30) calendar days following execution of this Agreement by both parties, Buyer shall secure title insurance commitments for the Fee Properties, which shall provide, upon recordation or filing of appropriate deeds, for the issuance of ALTA Form B title insurance policies insuring fee title to the Fee Properties to the

Buyer or its assignees as provided herein, free and clear of all liens, encumbrances, defects in title and other matters of record except real estate taxes and assessments not then due and payable or such matters as are acceptable to Buyer. Buyer shall pay the cost of title examination and title insurance coverage in amounts Buyer may require. Buyer shall have thirty (30) days after receipt to review said commitments. If Buyer, in its opinion, determines that there exists any exception to insurance coverage which is not reasonably acceptable, then Buyer shall notify Seller within such thirty (30) day period of such exception. Any liens or encumbrances or other instruments affecting title which are recorded after said thirty (30) day period may be considered objections to title.

(b) <u>Defects in Title</u>. Seller shall within thirty (30) days following notification of any defect diligently endeavor to cure, or to make arrangements reasonably satisfactory to Buyer to cure, any such defect.

6.5 <u>Buyer's Investigation; Due Diligence</u>. Buyer will have the right for twenty one (21) days ("Due Diligence Period") after Effective Date to inspect the Properties, review the contracts and agreements relating to the Properties, review the status of title to the Properties and to make such other inspections (including environmental), feasibility determinations, or other studies as Buyer determines. Based on the conclusions that Buyer derives during the Due Diligence Period, Buyer may notify Seller within said Due Diligence Period in writing of its intent not to close the proposed transaction it if is not satisfied in

its sole and absolute discretion with any matter relating to the Properties, in which case neither party shall have any further liability to the other. Each party shall be fully responsible to pay for all costs of its due diligence activities.

6.6    Loan Commitment. Buyer will have twenty one (21) days after the Effective Date of this Agreement ("Loan Commitment Period") to secure a written commitment for financing of up $7,250,000 of the Purchase Price ("Commitment"), in accordance with the terms set forth in Section 7.2 (f) below

6.7    Indemnification.

     (a)    Survival. The representations, warranties, indemnities, covenants and other agreements herein set forth shall be deemed to be continuing and shall survive the Closing for three years.

     (b)    Seller's Indemnification to Buyer. Seller shall indemnify and hold Buyer and its affiliates harmless from and against all claims, expenses (including reasonable attorney's fees), losses and liabilities resulting from (i) any material breach by Seller of any of Seller's representations, warranties, and covenants set forth in this Agreement or instrument of conveyance delivered by Seller pursuant to this Agreement or (ii) any obligation or liability relating to the ownership or operation of the Assets prior to the Closing ("Loss" or "Losses"); *provided, however,* any obligation and liability that may arise as a result of environmental contamination and tanks ("Environmental Loss") shall be governed by Section 6.1, 6.2 and

6.3 above.

(c) <u>Buyer's Indemnification to Seller</u>. Buyer shall indemnify and hold Seller and its affiliates harmless from and against all claims, expenses (including reasonable attorneys' fees), losses and liabilities resulting from (i) any material breach by Buyer of any of Buyer's representations, warranties and covenants set forth in this Agreement or in any agreement or instrument delivered by Buyer pursuant to this Agreement or (ii) any obligation and liability relating to the ownership or operation of the Assets subsequent to the Closing; *provided, however*, that any obligation or liability that may arise as a result of environmental contamination and tanks shall be governed by Sections 6.1, 6.2 and 6.3 above.

(d) <u>Notice of Claims</u>. The indemnified party shall give prompt written notice of any claim against it which may give rise to a claim against the indemnifying party under the foregoing indemnities and the indemnifying party shall undertake the defense, compromise or settlement of any such matter. The indemnified party shall cooperate in and provide reasonable assistance with respect to any such defense, compromise or settlement. Failure to provide prompt notice of a claim as provided in this Section 6.8(d) shall constitute a waiver of the right to indemnification with respect to such claim to the extent the indemnifying party is prejudiced by the delay in providing such notification.

7.    **CONDITIONS PRECEDENT TO CLOSING.**

7.1    <u>Seller's Conditions Precedent</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties made by Buyer in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing. Seller shall have received from Buyer at the Closing satisfactory certificates to such effect signed by an authorized officer of Buyer.

(b)    <u>Compliance</u>. Buyer shall have performed and complied with all provisions of this Agreement required to be performed or complied with by Buyer prior to the Closing.

(c)    <u>No Litigation</u>. No action or proceeding by or before any governmental authority shall have been instituted (and not subsequently dismissed, settled or otherwise terminated), which might restrain, prohibit or invalidate any material portion of the transactions contemplated by this Agreement.

(d)    <u>Guaranty</u>.     Seller shall have received a personal guaranty from Mr. Kenneth C. Morrison in the form set forth in the attachment to the Promissory note in Exhibit I.

(e)   Mortgage.   Seller shall have received a mortgage from Buyer on the Properties listed on Exhibit A if permitted by Buyer's lender.

(f)   All of the Exhibits attached to this Agreement shall be completed to the mutual satisfaction of Buyer and Seller.

7.2   Buyer's Condition Precedent. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to each of the following conditions:

(a)   Representations and Warranties. The representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing. Buyer shall have received from Seller at the Closing satisfactory certificates to such effect signed by an authorized officer of Seller.

(b)   Compliance. Seller shall have performed and complied with all provisions of this Agreement required to be performed or complied with by Seller prior to the Closing.

(c)   No Litigation. No action or proceeding by or before any governmental authority shall have been instituted (and not subsequently dismissed, settled or otherwise terminated), which might restrain, prohibit or invalidate any material portion of the transactions contemplated by this Agreement.

(d)  <u>Title Commitments</u>. A reputable title company acceptable to Buyer shall have issued to Buyer, at least fourteen (14) business days prior to the Closing, the commitments to issue owner's policies of title insurance referred to in Section 6.4 above.

(e)  <u>Environmental Evaluations; Title Search; and Due Diligence</u>. The results of the Environmental Evaluations, title search and due diligence conducted in accordance with Sections 6.2, 6.4 and 6.5 shall be satisfactory to Buyer in its sole discretion; provided, if Buyer has not completed its Environmental Evaluations by the conclusion of the Due Diligence Period, Buyer may elect to waive this pre-condition and proceed to Closing, in which case Buyer and Seller agree that all of the provisions in Sections 6.1, 6.2 and 6.3 shall remain in full force and affect.

(f)  <u>Loan Commitment</u>. Buyer shall have received a Commitment in accordance with Section 6.6 above from a lender of Purchaser's selection to finance the purchase of the Properties on terms acceptable to Buyer.

(g)  <u>Assignments</u>. Buyer and Seller shall have successfully arranged for the assignment by Seller and assumption by Buyer of all wholesale unbranded supply contracts in place between Seller and its suppliers for the delivery of fuel to the Properties.

(h)  <u>Consents.</u> Seller shall have secured all consents and approvals required for the sale of the Properties, including waiver of any and all contractual rights of Gulf Oil with respect to the Properties and Subordination and

Non-Disturbance Agreements from the owners of the two leased Properties.

(i)    Exhibits. All of the Exhibits attached to this Agreement shall be completed to the mutual satisfaction of Buyer and Seller.

(j)    Barnegat Lease.    The Seller shall have arranged for a ten (10) year extension of the Barnegat Lease upon terms acceptable to Buyer.

## 8.    MISCELLANEOUS.

8.1    Bulk Sales. All debts, obligations and liabilities of Seller, including taxes, not expressly assumed pursuant to this Agreement with respect to the Properties shall be promptly paid and discharged by it as and when they become due and payable. Seller agrees to indemnify Buyer against and in respect of any and all loss, liability and damage sustained by Buyer as a result of the failure of Seller to pay and discharge as and when due any such debt, obligation or liability, including taxes, not assumed by Buyer. Seller further agrees that Buyer has the right to offset any damages or costs incurred against payments required to be paid to Seller under Section 2 above.

8.2    Payment of Expenses and Fees. Buyer and Seller shall each bear their own costs and expenses, except as may be otherwise provided in Section 6.1, 6.2 and 6.3 above, including but not limited to attorneys' fees incurred in connection with the transactions contemplated in this Agreement.

8.3    Publicity. Seller and Buyer shall jointly plan and coordinate all notices to third parties and all other publicity concerning the transactions contemplated by this

Agreement. Seller and Buyer agree not to disclose the Purchase Price in such notices or publicity or otherwise.

8.4     Additional Assurances. From time to time at the request of Buyer, Seller shall execute and deliver, or cause to be executed and delivered, such instruments and documents and take such other action as Buyer may reasonably request to more effectively assign, transfer and convey to Buyer or its permitted assignees any of the Assets and to protect the right, title and interest of Buyer therein and the enjoyment by Buyer thereof and otherwise to carry out the intent of this Agreement. From time to time at the request of Seller, Buyer shall execute such further documents and instruments as Seller may reasonably request to consummate or evidence the transactions contemplated by this Agreement or otherwise to carry out the intent of this Agreement.

8.5     Assignment. Neither Seller nor Buyer may assign rights or delegate duties hereunder without the prior written consent of the other party.

8.6     Entire Agreement. This Agreement, including the Exhibits and other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement between Seller and Buyer with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto. No amendment hereof shall be binding on the parties unless in writing and signed by authorized representatives of both parties. The headings used in this Agreement are for convenience of reference only and shall not be used to define the meaning of any provision.

8.7   <u>Severability</u>. The provisions of this Agreement shall be severable, and in the event any provision hereof shall be finally determined to be illegal or unenforceable, the remaining provisions shall remain in full force and effect. Any provision finally determined to be illegal or unenforceable may be reformed to make it legal and enforceable. The parties agree to negotiate in good faith any such reformation.

8.8   <u>Notices</u>. All notices and consents to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, telefaxed with confirmation of receipt, mailed by certified mail or delivered by a recognized commercial courier to the party at the address set forth above or such other address as any party shall have designated by 10 days' notice to the other party at the address set forth in the preamble to this Agreement, together with a copy to counsel as follows:

|  |  |
|---|---|
| If to Seller: | [Name of Seller]<br>1 Union Street<br>Suite 208<br>Robbinsville, NJ 08691 |
| If to the Creightons: | Mr. and Mrs. Jan Creighton<br>1 Union Street<br>Suite 208<br>Robbinsville, NJ 08691 |
| With a copy to: | David R. Forrey, Esq.<br>Lewis & Morey, L.L.C.<br>34 Chambers Street<br>Princeton, NJ 08542 |

If to Buyer:          Sycamore Petroleum, LLC
                      630 Skippack Pike
                      Blue Bell, PA 19422

With a copy to:      David A. Feldheim, Esq.
                      600 W. Germantown Pike
                      Suite 400
                      Plymouth Meeting, PA 19462

8.9    No Third party Beneficiaries. This Agreement is not intended to and does not confer any rights or obligations on any party that is not a signatory to this Agreement.

8.10   Governing Law. This Agreement shall be interpreted in accordance with and governed by the law of the Commonwealth of Pennsylvania, without reference to principles of conflicts of laws.

8.11   Venue. Any action to enforce this Agreement, or to interpret or construe the meaning of this Agreement, shall be brought in the Federal District Court for the Eastern District of Pennsylvania, and Purchaser and Seller hereby expressly waive venue in any other Federal or State court.

**************************************************************************
Signatures on Next Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized signatories as of the date first above written.

SYCAMORE PETROLEUM, LLC

By: _Kenneth C. Morrison_

Print Name: _Kenneth C. Morrison_

Title: _President / CEO_

Date: _11/14/2011_


KC OIL, INC.

By: _____

Print Name: _____

Title: _____

Date: _____


GREENWOOD ENTERPRISES INC.

By: _____

Print Name: _____

Title: _____

Date: _____


BUCKS COUNTY PETROLEUM LLC

By: _____

Print Name: _____

Title: _____

Date: _____


TRENTON PETROLEUM INC.,

By: _____

Print Name: _____

Title: _____

Date: _____


CREIGHTON FAMILY PROPERTIES, LLC

By: _____

Print Name: _____

Title: _____

Date: _____

November 9, 2011                           37

JAN CREIGHTON                          KIMBERLY CREIGHTON

_____                _____

Date: _____          Date: _____

11/17/2011  14:46  609-924-0782          Lewisaruries    (FAX)                    P.001/001

JAN CREIGHTON

Date: 11-15-11

KIMBERLY CREIGHTON

Date: 11-16-11

November 9, 2011                    38

11/15/2011  11:38  608-924-0182          Lewis&Forrey                    #0473 P.003/004

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized signatories as of the date first above written.

SYCAMORE PETROLEUM, LLC.

By: _Kenneth P. Morrison_

Print Name: _Kenneth P. Morrison_

Title: _President/CEO_

Date: _11/14/2011_

KC OIL, INC.

By: _Jon J Creighton_

Print Name: _Jon J Creighton_

Title: _President_

Date: _11-14-11_

GREENWOOD ENTERPRISES INC.

By: _Jon J Creighton_

Print Name: _Jon J Creighton_

Title: _President_

Date: _11-14-11_

BUCKS COUNTY PETROLEUM LLC

By: _Jon J Creighton_

Print Name: _Jon J Creighton_

Title: _President_

Date: _11-14-11_

TRENTON PETROLEUM INC.,

By: _Jon J Creighton_

Print Name: _Jon J Creighton_

Title: _President_

Date: _11-14-11_

CREIGHTON FAMILY PROPERTIES, LLC

By: _Jon J Creighton_

Print Name: _Jon J Creighton_

Title: _President_

Date: _11-14-11_

P.002/003                    (FAX)                          11/15/2011 11:38

# EXHIBIT A

## PROPERTY LIST

| Station Name | Address | City | State | Zip |
|---|---|---|---|---|
| Arena Car Wash | 640 Arena Drive | Hamilton | NJ | 08690 |
| Barnegat Gulf | 282 Route 72 | Barnegat | NJ | 08005 |
| Chambers Street Gasco | 1140 Chambers Street | Hamilton | NJ | 08610 |
| Greenwood Gasco | 1761 Greenwood Avenue | Trenton | NJ | 08609 |
| Lambertville Gasco | 32 South Franklin Street | Lambertville | NJ | 08530 |
| Morrisville Gasco | 999 West Trenton Avenue | Morrisville | PA | 19067 |
| Pemperton Gasco | 2 Arney's Mount Road | Pemberton | NJ | 08068 |
| Southampton Gasco | 2344 Route 206&38 | Southampton | NJ | 08088 |
| Tri-Star Gasco | 1685 Nottingham Way | Hamilton | NJ | 08619 |
| West Creek Gasco | 439 Route 9 | West Creek | NJ | 08092 |
| Yardville Gasco | 4364 South Broad Street | Yardville | NJ | 08620 |
| Office/Warehouse | 230 US Route 130 South | Bordentown | NJ | 08505 |

EXHIBIT B

PERSONAL PROPERTY

(Jason furnishes Depreciation List)

# EXHIBIT C

## VEHICLES

### (To be furnished by KC)

**EXHIBIT D**

**DEED**

(To be furnished by Sycamore)

EXHIBIT E

BILL OF SALE

(To be furnished by Sycamore)

# EXHIBIT F

## PROMISSORY NOTE

(To be furnished by Sycamore)

**EXHIBIT G**

**VEHICLE LEASES AND LOANS**

(To be furnished by KC)

EXHIBIT H

SELLER DISCLOSURE STATEMENT

(To be furnished by KC)

# EXHIBIT B

**Schweder, II, John L.**

**Subject:**       FW: 2011 volume
**Attachments:**   doc20120120171734.pdf

**From:** Ken Morrison
**Sent:** Tuesday, January 24, 2012 6:35 PM
**To:** Jason Tarbart
**Subject:** 2011 volume

**From:** Jan J. Creighton [mailto:Jan@k-coil.com]
**Sent:** Tuesday, January 24, 2012 3:27 PM
**To:** Ken Morrison
**Cc:** David R. Forrey
**Subject:** FW:

       KC ENERGY GROUP
        K C OIL INC. – GASCO
   Jan J. Creighton, President
   PH:609-208-2002 FAX:609-208-2012
       Jan@k-coil.com

**From:** Joel Casterline
**Sent:** Tuesday, January 24, 2012 3:22 PM
**To:** Jan J. Creighton
**Subject:** FW:

Jan,

This is what I sent you on 1/20.  I also sent this to you numerous times.  Please let me know that this satisfies this issue.  Thanks again.

**From:** Joel Casterline
**Sent:** Friday, January 20, 2012 4:08 PM
**To:** Jan J. Creighton
**Subject:**

Best regards,

   Joel Casterline
    Vice President

1





1 Union St., Suite 208, Robbinsville, NJ 08691
PH:609-208-2002  FAX:609-208-2012
joel@k-coil.com
www.k-coil.com

# KC OPERATING DATA YTD NOV. 2011

| | CHAMBERS | GREENWOOD | HAMILTON | LAMBERTVILLE | PEMBERTON | PENNINGTON | SOUTHAMPTON |
|---|---|---|---|---|---|---|---|
| **Volume (gallons)** | | | | | | | |
| Regular | 1,092,219.51 | 620,966.87 | 1,262,396.70 | 564,503.26 | 410,575.27 | 874,777.10 | 724,933.00 |
| Plus | 91,472.15 | 60,209.40 | 62,821.49 | 27,476.75 | 13,321.82 | 70,746.59 | 25,000.94 |
| Super | 54,091.11 | 50,955.02 | 58,959.77 | 31,964.32 | 17,414.64 | 87,366.82 | 35,567.38 |
| Diesel | N/A | N/A | N/A | 38,577.99 | N/A | N/A | N/A |
| Kerosene | N/A | N/A | N/A | 85,719.60 | 18,503.46 | N/A | 151,609.49 |
| Heating Oil | N/A | N/A | N/A | 33,938.86 | N/A | N/A | 6,320.99 |
| TOTAL | 1,237,782.76 | 732,131.29 | 1,384,177.95 | 782,180.78 | 459,815.19 | 1,032,890.51 | 943,431.81 |
| **Sales (in dollars)** | | | | | | | |
| Regular | $ 2,869,736.92 | $ 2,157,997.41 | $ 3,420,513.35 | $ 1,850,222.54 | $ 1,033,693.54 | $ 3,035,384.32 | $ 1,916,330.46 |
| Plus | $ 240,337.21 | $ 209,241.02 | $ 170,217.28 | $ 90,058.10 | $ 33,539.97 | $ 245,483.22 | $ 66,088.96 |
| Super | $ 142,120.92 | $ 177,079.97 | $ 159,753.80 | $ 104,766.63 | $ 43,844.33 | $ 303,153.66 | $ 94,020.90 |
| Diesel | N/A | N/A | N/A | $ 280,955.56 | N/A | #VALUE! | N/A |
| Kerosene | N/A | N/A | N/A | $ 126,443.67 | $ 46,585.63 | #VALUE! | $ 400,773.43 |
| Heating Oil | N/A | N/A | N/A | $ 111,238.42 | #VALUE! | #VALUE! | $ 16,709.28 |
| TOTAL SALES | $ 3,252,195.06 | $ 2,544,318.39 | $ 3,750,484.43 | $ 2,563,684.93 | $ 1,157,663.47 | $ 3,584,021.19 | $ 2,493,923.03 |
| **Gross Profit ($)** | | | | | | | |
| Regular | $ 360,694.57 | $ 205,068.10 | $ 568,078.51 | $ 310,612.28 | $ 124,523.37 | $ 507,580.66 | $ 326,393.84 |
| Plus | $ 27,715.15 | $ 19,883.55 | $ 37,064.68 | $ 14,308.24 | $ 5,628.34 | $ 51,697.37 | $ 10,185.38 |
| Super | $ 16,646.00 | $ 16,827.38 | $ 40,682.24 | $ 15,270.63 | $ 5,629.98 | $ 60,085.66 | $ 12,723.87 |
| Diesel | N/A | N/A | N/A | $ 46,768.61 | N/A | N/A | N/A |
| Kerosene | N/A | N/A | N/A | $ 34,068.22 | $ 7,967.59 | N/A | $ 78,169.85 |
| Heating Oil | N/A | N/A | N/A | $ 27,395.45 | N/A | N/A | 7099.11 |
| TOTAL GROSS PROFIT | $ 405,055.71 | $ 241,779.04 | $ 645,825.43 | $ 448,423.44 | $ 143,749.28 | $ 619,363.69 | $ 434,572.05 |

## KC OPERATING DATA YTD NOV. 2/KC OIL SITE LEVEL OPERATING DATA YTD NOV. 2011

| | | TRISTAR | WEST CREEK | YARDVILLE | BARNEGAT | MORRISVILLE |
|---|---|---|---|---|---|---|
| Volume (gallons) | Regular | 752,096.69 | 485,450.65 | 638,207.19 | 305,554.24 | 337,492.17 |
| | Plus | 60,007.71 | 21,096.54 | 29,105.38 | N/A | 15,246.22 |
| | Super | 40,348.04 | 24,625.42 | 48,559.24 | 20,234.90 | 445,492.86 |
| | Diesel | 282,664.91 | 232,905.84 | 38,153.69 | 399,476.09 | N/A |
| | Kerosene | 7,886.73 | 3,068.59 | N/A | N/A | N/A |
| | Heating Oil | N/A | N/A | N/A | N/A | N/A |
| | **TOTAL** | **1,143,004.09** | **767,147.05** | **754,025.51** | **725,265.23** | **798,231.25** |
| Sales (in dollars) | Regular | $ 2,121,191.72 | $ 1,396,763.46 | $ 1,811,883.82 | $ 708,762.80 | $ 1,017,382.89 |
| | Plus | $ 169,244.02 | $ 60,700.06 | $ 82,630.81 | #VALUE! | $ 45,960.30 |
| | Super | $ 113,796.46 | $ 70,853.52 | $ 137,860.73 | $ 46,936.82 | $ 1,342,955.04 |
| | Diesel | $ 797,219.93 | $ 670,128.61 | $ 108,319.14 | $ 926,623.67 | #VALUE! |
| | Kerosene | $ 22,243.50 | $ 8,829.10 | #VALUE! | #VALUE! | #VALUE! |
| | Heating Oil | #VALUE! | #VALUE! | #VALUE! | #VALUE! | $ - |
| | **TOTAL SALES** | **$ 3,223,695.63** | **$ 2,207,274.74** | **$ 2,140,694.50** | **$ 1,682,323.29** | **$ 2,406,298.23** |
| Gross Profit ($) | Regular | 338,624.01 | 242,841.83 | 338,402.98 | 97,089.86 | 115,503.32 |
| | Plus | 24,047.49 | 10,985.81 | 13,992.12 | N/A | 6,273.67 |
| | Super | 14,434.11 | 15,212.11 | 21,256.32 | 10,333.76 | 156,942.68 |
| | Diesel | 157,048.62 | 97,960.20 | 19,672.04 | 144,011.13 | N/A |
| | Kerosene | 9,929.39 | 3,863.35 | N/A | N/A | N/A |
| | Heating Oil | N/A | N/A | N/A | N/A | N/A |
| | **TOTAL GROSS PROFIT** | **$ 544,083.63** | **$ 370,863.31** | **$ 393,323.47** | **$ 251,434.75** | **$ 278,719.67** |

# EXHIBIT C

## ASSET PURCHASE AGREEMENT
(Two Sites)

**FOR AND IN CONSIDERATION** of the mutual benefits accruing and expected to accrue hereunder, this Asset Purchase Agreement ("Agreement") is entered into as of the ___ day of November, 2011 ("Effective Date"), by and between SYCAMORE ENERGY, LLC, a Pennsylvania limited liability company with its principal place of business at 630 Skippack Pike, Blue Bell, PA 19422 or its designee, ("Buyer"), and KC OIL, INC., GREENWOOD ENTERPRISES INC., BUCKS COUNTY PETROLEUM LLC, TRENTON PETROLEUM INC., CREIGHTON FAMILY PROPERTIES, LLC and JAN & KIMBERLY CREIGHTON, with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691(individually and collectively the "Seller" or "Sellers"), all of whom, intending to be legally bound, hereby agree as follows:

Seller desires to sell or assign to Buyer, and Buyer desires to purchase or accept assignment from Seller, on the terms set forth herein, certain of Seller's assets used in the operation of Seller's business of supplying gasoline and heating oil to commercial and residential accounts ("Business"), including Buyer's purchase of two real property locations ("Properties") more fully described in Exhibit A.

Accordingly, the parties, intending to be legally bound, hereby agree as follows:

1.   **PURCHASE AND SALE OF ASSETS.**

1.1   Assets to be Sold. Seller shall sell, transfer and assign to Buyer, at the Closing (as defined in Section 2.6 below), and Buyer shall purchase and receive, at the Closing, all right, title and interest of Seller in the following assets ("Assets"):

(a)   Fee Property Assets.

(i)   <u>Real Property</u>. The two (2) Fee Properties listed in attached <u>Exhibit A</u> together with (A) all structures, buildings, compressors, appliances, electrical, plumbing, heating, ventilating and air conditioning machinery and of every kind, character and description appurtenant to the Properties, and all parking facilities and other improvements located on the Properties, which machinery and equipment shall be in working order at the time of the Closing; and (B) all the right, title and interest of Seller in any land lying in the bed of any public street, road or avenue opened or proposed in front of or adjoining the Properties, and all right, title and interest of Seller in and to any award made or to be made in lieu thereof and to any unpaid award for damage to the Properties by reason of a change of grade of any street, and all rights of way, privileges and appurtenances pertaining to the Properties.

(ii)  <u>Personal Property</u>. The tangible personal property, including goods, furniture, furnishings, fixtures, equipment, usable supplies and all other tangible personal property currently located on or at the Properties by Seller, as listed on attached <u>Exhibit B</u> ("Personal Property").

(iii) <u>Inventory</u>. Inventories of fuel products at the Fee Properties, to be valued at the Closing in accordance with Section 2.3 below.

(b)   Heating Oil Business.

(i)   Vehicles. All motor vehicles set forth in attached Exhibit C.

(ii)   Customer List. A complete and accurate list attached as Exhibit D of commercial, retail and bid Customers for commercial and residential heating oil ("Business") as of the Closing Date, including a detailed listing of volumes purchased for the past three (3) years and identification of those Customers who are pre-paid budget or burner service contract customers and the financial standing of each such customer as of the Closing Date.

(iii)   Fuel Inventory.   Bulk and bottled motor oil stored at the warehouse.

(iv)   Burner and Service Parts. All non-obsolete burner and service parts inventory.

(v)   Contracts. All budget customer, burner service, contract distillate bid business and other contracts as set forth in attached Exhibit E.

(vi)   Other Assets Used in the Business. All other assets used in connection with the operation of Seller's heating oil and retail gasoline and distillate business in Hunterdon, Mercer, Burlington and Ocean counties ("Territory"), including copies, or originals as agreed, of books, records and other papers which Seller and Buyer agree are necessary for Buyer to service Seller's heating oil or other petroleum customers.

(vii) <u>Name</u>. The right and license for Buyer to use the names "KC Oil", "Marriott", "Snyder", "Koenig" and all other trade names and trademarks and similar derivatives used in the Business.

(viii) <u>Phone Numbers; Web Sites.</u> Transfer to Buyer of all phone numbers and Web Sites used in the operation of the Properties and the Business.

(ix) <u>Books and Records.</u> All books, records, software (whether owned or licensed, and, if licensed, assignment of such licensed rights), office supplies and equipment.

(x) Assignment of Lease. Assignment of the Office Lease for the office space in Robbinsville, New Jersey.

(c) <u>Cash and Credit Card Receipts.</u>    Seller shall be entitled to keep all cash in the drawer on the day of the Closing. Buyer shall be entitled to keep all credit card payments arising from all transactions at the Properties or arising from the Business prior to, on and after the Closing.

(d) <u>No Merger;</u> No Successor in Interest. Buyer and Seller affirm that they intend this Agreement to provide the terms and conditions for the purchase and sale of certain specified assets and the assumption of several explicitly described liabilities; Buyer is not purchasing all of the Seller's assets; Buyer will not be offering employment to all of the Seller's owners and/or employees; and the parties expressly acknowledge and agree that neither this transaction nor the Agreement is intended to (i) create a merger

between the parties, either by contract or operation of law, or confer "successor in interest" status on the Buyer.

1.2    <u>Conveyancing Instruments</u>. The title to the Fee Properties to be conveyed by Seller pursuant to Section 1.1 above shall be conveyed by means of bargain and sale deed with covenant against grantor's acts in the form of attached <u>Exhibit F</u>. The remaining Assets shall be conveyed pursuant to one or more bills of sale and assignments in the form of attached <u>Exhibit G</u>.

1.3    <u>Covenants Not to Compete</u>. At the Closing, all Sellers shall agree to be bound by the following restrictive covenants commencing at the Closing, each of which is hereby acknowledged to be fair and reasonable and each of which will be memorialized in a separate instrument to be signed by each Seller:

    (a)    <u>Covenant</u>. Sellers covenant and agree that, for the sixty (60) months commencing at the Closing, Sellers shall not sell any distillate, kerosene, diesel fuel, off road diesel, gasoline, r heating oil, natural gas or electricity to (I) any customers on the Customer List; or (II) any location in the Territory or any counties adjacent to the Territory.

    (b)    <u>Non-Disclosure</u>. Seller expressly acknowledges that the Customer List and other trade secrets of Seller associated with the Customer List being purchased and sold pursuant to this Agreement are valuable assets, and hereby further covenants and agrees that Seller shall not at any time after the Closing use or permit the use, by Seller or any person or entity under its control, of either the Customer List or any such trade secrets or directly or indirectly communicate or divulge the

contents of the Customer List or any such trade secrets to any person or entity whatever.

## 2. PURCHASE PRICE AND TERMS OF PAYMENT.

2.1    Purchase Price. Subject to the adjustments for advance payments pursuant to Section 2.2 below, the purchase price for the Assets ("Purchase Price") shall be Two Million Dollars ($2,000,000) plus the (a) value of the Fuel Inventory, calculated as set forth below, and (b) the Net Accounts Receivable:

2.2    Adjustment for Certain Customer Advance Payments. An adjustment to the Purchase Price set forth in Section 2.1 above shall be made to provide Buyer a credit for monies received by Seller from customers on the Customer List pursuant to prepaid budget plans, burner service plans or any other prepayment arrangements to the extent the payments received by Seller exceed the value of the products or services delivered prior to the Closing, using the calculation described in attached **Exhibit H**.

2.3    Determination of Fuel Inventory. Buyer and Seller shall (i) jointly determine the actual quantities of fuel at the two Fee Properties and bulk and bottled motor oil inventory stored at the warehouse, on the day of the Closing; and (ii) jointly compute the value of the fuel and bulk and bottled motor oil inventory using the lower of Seller's delivered cost or market value as evidenced by documentation furnished by Seller.

2.4    Accounts Receivable. Seller shall deliver to Buyer at the Closing a true and accurate lists containing the name and address of each of Seller's customers who are currently indebted to it as of the date of the Closing, together with the

amount due from each such customer. The Buyer shall have the exclusive right and responsibility to collect such accounts for its own account for ninety (90) days from the Closing Date, and shall make the customary effort used in the regular course of its business to collect the same. Within ten (10) days of the end of the ninety (90) days following the Closing Date, Seller shall repurchase all uncollected accounts receivable from Buyer at face value.

2.5   <u>Payment of Purchase Price</u>. At the Closing, in lieu of payment in cash, the Seller shall accept a Promissory Note from Buyer in the amount of Two Million Dollars ($2,000,000), payable in equal monthly payments of principal and interest over Ten (10) years at Six Percent (6.00%), in the form attached as <u>**Exhibit I**</u>. The Promissory Note shall be secured by (a) a personal guaranty from Mr. Kenneth C. Morrison, one of the Members of the Purchaser, in the form attached to the Promissory Note in Exhibit I; and (b) a mortgage on the two Fee Properties listed in <u>**Exhibit A.**</u>

2.6   Limited <u>Assumption of Liabilities; Disclaimer</u>.

(a)   <u>Liabilities Assumed</u>. On the date of Closing Buyer shall assume and undertake only Seller's obligations with respect to (I) prepaid budget customer agreements; (II) all vehicle leases and loans; and (III) the other contracts set forth in attached <u>**Exhibit E**</u>, referred to in Section 1.1 (b) (iv) above, and no others; *provided, however,* that Buyer shall not be obligated to sell any petroleum product to any customer if the customer's tank does not meet Buyer's reasonable requirements for tank integrity and environmental conditions or does not meet

regulatory requirements for tanks in effect on the date of the Closing.

(b)   Liabilities Not Assumed.

(i)   Buyer is not assuming, and Buyer hereby does not assume, any commitment, liability or obligation of Seller as a result of Buyer's purchase of the Business or the Properties except as expressly set forth in attached **Exhibit E**, and Buyer expressly disclaims responsibility for any liability not listed on **Exhibit F.**

(ii)  With respect to equipment, Buyer is acquiring only those items of equipment specifically identified in attached **Exhibit B** and is not acquiring or assuming  any obligation or liability whatsoever with respect to any underground or above-ground storage tanks and related piping or any other equipment of Seller or third parties at any locations except the equipment specifically identified in attached **Exhibit B,**  which are to be conveyed pursuant to the deeds and bills of sale as more fully set forth in Section 6 below, and Buyer hereby expressly disclaims responsibility for any liability not listed on **Exhibit B,.**

2.7   Closing. The Closing of the transactions contemplated hereby and the transfer of the Assets ("Closing") shall occur on or before seventh calendar day following expiration of the Due Diligence Period, at the offices of Hopewell Valley Bank in Pennington, New Jersey or at such other time and place as Seller and Buyer may agree in writing; provided, Buyer shall have the right to postpone the Closing one time by up to eight (8) days by delivery of written

notice to Seller prior to the scheduled Closing date.

3.    **EMPLOYEES AND BENEFITS.**

3.1    Employees. Buyer shall have the right but not the obligation to offer employment to any or all of Seller's employees who currently work as drivers, burner-service technicians, office personnel and managers at the Fee Properties or in connection with the Business, such employment offers being under whatever terms and conditions that the Buyer shall deem appropriate. It shall be in the sole discretion of the affected employees or supervisory personnel to elect to accept any such offers of employment. Neither Seller nor any of its affiliate corporations shall offer employment to said employees unless Buyer does not offer them employment within 30 days following the Closing.

3.2    Benefit Plans. Buyer is not assuming any liability for any employee plans, programs, practices and arrangements, including but not limited to any employee benefit plan as that term as is defined in Section 3(s) of the Employee Retirement Income Security Act of 1974 .("Employee Plans"). Seller shall indemnify and hold Buyer harmless from any such liability arising under any Employee Plans in accordance with Section 6.8 below.

4.    **TAXES AND ALLOCATED EXPENSES.**

4.1    Payment of Excise Taxes. Seller shall collect from Buyer at the Closing, make all required reports, and pay directly to each and every taxing authority any and all taxes, fees and assessments which arise as a result of this Agreement (collectively "Excise Taxes"), to the extent that the statute imposing any such

Excise Tax imposes an obligation on a buyer, user or operator to pay such taxes. Following the Closing, Seller shall have no further obligation in this regard. "Excise Taxes" shall include, without limitation, any license, registration or fees and all sales, use, excise, motor fuel, gross receipts, stamp, plus any penalties or interest thereon, which shall be levied or assessed by any foreign, federal, state or local government or other taxing authority with respect to the Assets conveyed, assigned or transferred pursuant to this Agreement. "Excise Taxes" shall exclude income, franchise, or like taxes levied on or measured by Buyer's net income.

4.2     Property Taxes. All real estate (except transfer), ad valorem and personal property taxes and charges on any of the Assets (collectively "Property Taxes") shall be prorated between Seller and Buyer as of the date of the Closing. With regard to any special or general assessments against any of the Assets which are payable in installments, Buyer shall be responsible for all payments which fall due subsequent to the date of the Closing and Seller shall be responsible for all payments which fall due on or prior to the date of the Closing. Buyer shall account to Seller for and shall pay to Seller at the Closing, Buyer's pro rata share of any Property Taxes paid by Seller prior to the date of the Closing.

4.3     Transfer Tax. The expense and cost of all federal, state and local documentary stamp, conveyance, transfer and other taxes or charges in lieu thereof relating to the sale and conveyance of the Fee Property shall be paid by Seller. All federal, state or local taxes, including sales taxes, relating to the sale and

conveyance of the personal property hereunder shall be paid by Buyer.

4.4    Tax Liability. Except as otherwise provided herein (i) Seller shall be responsible for and pay all taxes levied or imposed upon or in connection with the conduct or operation of the Business prior to the date of the Closing; and (ii) Buyer shall be responsible for and pay all taxes levied or imposed upon or in connection with the conduct or operation of the Business on and after the date of the Closing. Any interest and penalties arising in connection with taxes due under this Section 4.5 shall be the responsibility of the party required to timely file correct tax returns concerning such taxes and pay the taxes required to be paid thereunder.

4.5.    Tax Filings. Seller shall be responsible for timely filing of all tax returns required by law to be filed in respect to the ownership of the Assets and the operation of the Business as of the date of the Closing. All taxes indicated as due and payable on such returns shall be paid by Seller as and when required by law, except for such taxes as may be contested by Seller in good faith. Buyer shall be responsible for timely filing of all tax returns required by law to be filed in respect of the ownership and the operation of the Business after the date of the Closing. All taxes indicated as due and payable on such returns shall be paid by Buyer as and when required by law, except for such taxes as may be contested by Buyer in good faith.

4.6    Tax Information. Each party to this Agreement shall provide the other party with access to all relevant documents, data and other information which may be required by the other party for the purpose of preparing tax returns and

responding to any audit by any governmental agency. Each party to this Agreement shall cooperate with all reasonable requests of the other party made in connection with resisting or contesting the imposition of taxes. Notwithstanding anything to the contrary in this Agreement, neither party to this Agreement shall be required at any time to disclose to the other income tax returns or other confidential tax information except to the extent required by government subpoena.

4.7   Deposits and Prepaid Expenses. Any refundable deposits, prepaid expenses, prepaid rents and similar items relating to the Assets shall be prorated between the parties at and as of the date of the Closing.

4.8   Utilities. Charges for water, gas, power, light, Internet and other utility services shall be Seller's with respect to service up to and through the date of the Closing and shall be Buyer's with respect to service after the date of the Closing.

4.9   Environmental and Underground System Testing. The cost of underground system and environmental testing done in accordance with Section 6.1, 6.2 and 6.3 below shall be allocated in accordance with Section 6.1, 6.2 and 6.3 below.

5.   **REPRESENTATIONS AND WARRANTIES.**

5.1   Disclosures. Information may be added to the disclosures in attached **Exhibit J** (see below) between the date of execution of this Agreement and the date of the Closing; *provided, however,* that if any additional disclosure materially and adversely affects Buyer's ability to own or operate the Properties or the Business, then Buyer shall have the right to terminate this Agreement.

5.2   <u>Seller's Representations and Warranties</u>. Seller represents and warrants that, except as disclosed by Seller in writing prior to the Closing as shown on attached <u>Exhibit J</u>:

(a)   <u>Corporate Organization</u>. Each of the corporate Sellers is a corporation duly organized, validly existing, and in good standing under the laws of the State of New Jersey and has the corporate power and authority to own its property and to carry on the Business as now conducted, and to enter into and to carry out the terms and conditions of this Agreement.

(b)   <u>Corporate Authorization</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on behalf of Seller. Seller is not subject to any by-law, agreement, instrument, order or decree of any court or governmental body which would prevent or prohibit, in whole or in part, consummation of the transactions contemplated by this Agreement.

(c)   <u>No Brokers</u>. Seller is neither a party to nor in any way obligated under any contract or outstanding claim for the payment of any broker's or finder's fee or similar agency, and no person is entitled to a commission or other compensation in connection with the origin, negotiation, execution or performance of this Agreement.

(d)   <u>Litigation or Claims</u>. There is no legal action, claim or controversy, or governmental proceeding or investigation, pending or threatened

against Seller which would materially and adversely affect Buyer's ability to operate the Business and/or Assets in the manner in which they are now being operated or which would materially and adversely affect the value of the Assets.

(e) <u>Operation in Compliance with Laws</u>. The Assets are being operated in substantial compliance with all applicable laws, regulations and ordinances in all material respects.

(f) <u>Title to Personal Property</u>. Seller has good and merchantable title to the Personal Property transferred hereunder free of liens, charges or encumbrances of any nature, except any liens to be discharged at the Closing from the proceeds of the sale.

(g) <u>Title to the Properties</u>. Seller's interest in the Properties transferred hereunder shall be conveyed free of any rights of first refusal or other encumbrances, mortgages, liens, mechanics liens, security interests and other similar forms of financial obligations or liabilities, excepting liens for real property taxes or franchises taxes which are not yet due and payable. Seller is not in material violation of any law, regulation or ordinance relating to zoning or city planning at the Properties.

(h) <u>Customer List</u>. The Customer List attached as **Exhibit D** is true, accurate and complete, including (i) the volumes displayed; (ii) the identification of those Customers who are pre-paid budget or burner service contract customers; and (iii) the financial standing of each as of the Closing Date.

(i)    Collective Bargaining. None of Seller's employees related to the Business are covered under any collective bargaining agreements and there are no labor unions or pending petitions to or for labor unions representing employees of Seller employed in any capacity related to the Business, nor are there any material grievances of employees that would materially and adversely affect the Buyer's ability to operate the Business or the Properties as they are now being operated at the Properties.

(j)    Good Faith, Due Diligence. The representations and warranties made by Seller in this Agreement and any certificates to be furnished by Seller pursuant to this Agreement are made in good faith, and Seller has used due diligence to determine that there are no untrue or misleading statements or omissions of material facts contained therein. All of the information in the Exhibits and other material furnished by Seller to Buyer is true and complete in all material a lien against Assets, have been or will be paid by Seller.

(k)    Maintenance. The Assets have been maintained in operable condition and repair, and all equipment at the Properties or used in the Business is in good working order.

(l)    Taxes. All taxes, whether federal, state or local, which are or may become a lien against Assets, have been or will be paid by Seller.

(m)    Employment Contracts. There are no outstanding contracts for services with officers, employees, professional persons or firms or independent

contractors to which Seller is a party which materially and adversely affects its Business or its employees and which, as a result of the purchase contemplated by this Agreement, Buyer shall be responsible to assume.

(n)  Group Health and Pension Plans. Except the group health plan described on Exhibit E, which Buyer has agreed to assume and maintain until the Seller employees are transferred to the Buyer's health plan, there are no plans in effect or commitments for group health insurance, group life insurance, profit-sharing, pension or retirement or any other plans or similar benefits to which any employees of the Business may be entitled and which, as a result of the purchase contemplated by this Agreement, Buyer shall be responsible to assume.

(o)  Defaults on Contracts Assumed by Buyer. There has not occurred any material default of Seller in respect of any contract or obligation to be assumed by Buyer under this Agreement or any event which, with the lapse of time, shall become a material default under any such contract.

(p)  Compliance With Laws. Seller has complied with all applicable laws, orders and regulations of the federal, state and/or local governments or any agency thereof affecting the Business, including but not limited to the provisions thereof relating to wages, hours, collective bargaining and the payment of social security and unemployment taxes, and Buyer is not liable for any arrears of wages or any tax, damage or penalties for failure to comply with any of the foregoing.

(q)  <u>Execution and Delivery.</u> The execution and delivery of this Agreement, and the consummation of the transactions herein contemplated, shall not conflict with, or result in the breach of, or accelerate the performance required by, any terms of any agreement to which Seller is a party or constitute a default thereunder, or result in the creation of any lien, charge or encumbrance on the Fee Property or any of the Assets.

(r)  <u>Operations and Maintenance of Assets Prior to Closing.</u> After the Effective Date and prior to the Closing, Seller shall use and maintain the Properties and the Business in substantially the same manner in which they have been used and maintained prior to the date hereof, with a view toward maintaining such Properties and the Business associated therewith on at least as high a level as enjoyed on the date hereof. Seller shall use all reasonable efforts to preserve existing relations with the employees, suppliers and customers associated with the Properties and Business. Seller shall not materially alter the assets or remove any improvements, equipment or properties which comprise the assets, with the exception of items sold, transferred, disposed of or consumed in the ordinary course of business, without the written consent of Buyer. Seller shall promptly notify Buyer of any material matter affecting the Properties or the Business which arises from the date of this Agreement to the date of the Closing.

(s) <u>Insurance</u>.    Seller has maintained, and will continue to maintain through the Closing, adequate insurance for the operation of the Properties and the Business, and such insurance coverage will remain in place for claims arising after the Closing for events occurring on or at the Properties or arising from operation of the Business on or prior to the Closing.

(t) <u>Sales and Volumes</u>.    The sales figures and volume history for each of the Properties and for the Business furnished by Seller to Buyer are accurate and complete.

5.3 <u>Buyer's Representations and Warranties. Buyer represents and warrants</u>:

(a) <u>Corporate Organization</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the Commonwealth of Pennsylvania, and has the corporate power and authority to own its property and to carry on its business as now conducted and to enter into, and to carry out the terms and conditions of this Agreement.

(b) <u>Corporate Authorization</u>. The execution and delivery of this Agreement and the consummation the transactions contemplated hereby have been duly authorized by all necessary corporate action on behalf of Buyer. Buyer is not subject to any charter, by-law, agreement, instrument, order or decree of any court or governmental body which would prevent consummation of the transactions contemplated by this Agreement.

(c)    <u>Broker</u>. Buyer is not a party to, is not in any way obligated under, and has no knowledge of any contract or outstanding claim for the payment of any broker's or finder's fee in connection with the origin, negotiation, execution or performance of this Agreement.

6.    <u>DUE DILLIGENCE, ENVIRONMENTAL INVESTIGATION AND OTHER ADDITIONAL COVENANTS.</u>

6.1    <u>Environmental Definitions</u>.

(a)    <u>Environmental Liability</u>. "Environmental Liability" refers to any causes of action, fine, penalty, claim, demand, action, proceeding, liability, damage, loss or expense (including reasonable attorney fees) with respect to (i) the generation, recycling, processing, handling, presence, transportation, storage, treatment, or disposal of any "contaminant", as said quoted term is defined below; (ii) the release, emission, or discharge to surface soils, subsurface soils, surface waters or groundwater, including the release from the underground or above ground storage system (including products lines) or into air of any contaminant; (iii) exposure of any persons to contaminants; or (iv) any violation of any environmental law, ordinance, rule or regulation or cost recovery under any other law, regulation or order.

(b)    <u>Remediating the Assets</u>. "Remediating the Assets" refers to all efforts to cleanup On-Site Contamination and Off-Site Contamination to applicable state and federal regulatory levels as required by state and federal regulatory agencies which may include, but not be limited to,

free product recovery, clean-up of dissolved hydrocarbons, soil and water treatment or removal, equipment purchase and rental, well drilling, permit and license fees, laboratory analysis, contractor and sub-contractor costs (excluding reasonable attorneys' fees and costs of Buyer's or Seller's employees), preparation of any plans, documents or filing required by regulatory agencies, groundwater treatment monitoring costs and landfill and other costs for proper disposal or treatment of contaminated water and soil and transportation costs.

(c)    Contaminant. "Contaminant" means (i)" "hazardous substances" as defined by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et. seq.; (ii) "hazardous waste" as defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. 6901 et. seq.; or (iii) "non-hazardous" substances, materials, wastes, products, pollutants, chemicals or raw materials that are subject to regulation as of the date of the Closing and require monitoring, investigation and/or remediation by the appropriate governmental agency.

(d)    On-Site Contamination. "On-Site Contamination" means contamination within the legal boundaries of the Fee Property in surface soils, subsurface soils, surface waters or groundwater.

(e)    Off-Site Contamination. "Off-Site Contamination" means contamination outside the legal boundaries of the Fee Property that is present because of the migration of any contaminant from the Fee

Properties.

6.2     Environmental Tests and Inspections.

(a)     Environmental Assessment. Prior to the Closing, Buyer shall exercise its best efforts to complete an Environmental Assessment of the Properties. If the Environmental Assessment is not completed prior to the Closing, Buyer may elect to close on the transaction but continue the Environmental Assessment after the Closing, whereupon the results shall be presented to Seller. If the Seller in good faith does not agree with the Environmental Assessment, the Buyer's and Seller's consultants shall meet and mutually agree on the findings of the Environmental Consultant. The Environmental Assessment shall include, where necessary, the drilling and development of observation wells (or soil borings only where groundwater is not encountered) and review of existing samples, analytical results and other files and records. Buyer shall bear the costs of all tests and inspections that it elects to conduct pursuant to this Section 6.2(a). Copies of the written results of the Environmental Assessment shall be promptly forwarded to Seller, and Buyer shall formulate and submit all reports required by law regarding contamination discovered by the Environmental Assessment in accordance with the reporting requirements of regulatory agencies, including a copy to Seller, and in all events prior to the Closing or sooner if the regulations so require. If Seller's Environmental Assessment suggests the presence of Off-Site

Contamination, Seller shall, within one year following the Closing, conduct an assessment to identify the existence and extent of such contamination and to fully delineate the extent of such contamination.

(b) Tanks. Within two weeks prior to the Closing, Seller shall have the right, in its sole discretion to decide whether to (i) arrange for (X) Seller and Buyer jointly to visually inspect all the above ground tanks and for (Y) Buyer to perform line testing and sticking of the tanks for interstitial contamination or leaks on all underground tanks located at the Fee Properties at Buyer's expense, which results shall immediately be submitted to Seller; or (ii) accept Seller's most recent tank and line inspection results, copies of which have been furnished by Seller to Buyer. The test procedure used shall be mutually agreed to by the parties on gasoline tanks and waste oil or heating oil tanks, if any, to be acquired. Buyer shall promptly furnish Seller with copies of all system integrity test reports. Tests shall identify whether a defect is in a tank or line. In the event a line or tank fails testing, Seller shall correct such defect and any other defects until such line or tanks pass such test. In the event a tank or line does not test or retest tight, the cost of labor and materials associated with the repair or replacement of individual underground tanks and lines that fail testing and any associated treatment or disposal of contaminated soil and water associated with the tank or line removal shall be assumed by Seller, and all replacements shall be of lines or tanks as required under current

federal, state or local underground storage tank regulations.

(c) <u>Legal Compliance in Investigation and Remediation</u>. If Buyer or Seller does not materially comply with the law in conducting the investigation and remediation of Assets, Buyer or Seller, as the case may be, shall be entitled to notify the other party in writing of the shortcoming, and such other party shall have sixty (60) days in which to comply, unless an agency with jurisdiction orders such party to comply within a shorter deadline in which case such shorter deadlines shall apply.

6.3 <u>Environmental Liability.</u>

(a) <u>Retention by Seller</u>. Subject to the limitations set forth in this Agreement, Seller shall retain all liability and risk related to the Environmental Liability, directly or indirectly arising out of or related to the Assets and existing or occurring on or prior to the Closing. This provision with respect to Environmental Liability constitutes a fundamental part of the bargain between Seller and Buyer.

(b) <u>Seller's Responsibilities</u>. Seller shall be responsible for:

(i) Abandoned underground storage tanks discovered by the Buyer that require closure, removal and/or remediation, and floor drains discovered that require closure and cleaning

(ii) The costs associated with the treatment, proper removal, transportation and/or disposal or bio treatment of contaminated soil and groundwater existing on or prior to the Closing at the Fee Properties.

(iii)    Costs of remediation of any Contaminants to applicable state or federal regulatory standards or for any diminution in value of any properties other than the Fee Properties arising from the presence of Off-Site Contamination if the Contaminants have been identified in the Baseline Data as defined below. and if the Contaminants are attributable to the operation of the Fee Properties or the Business prior to the Closing or it is established that Seller withheld material facts regarding contamination occurring during Seller's period of ownership. In determining whether the Contaminants are attributable to the operation of the Fee Properties prior to the Closing, there shall be a rebuttable presumption that Contaminants first detected within two (2) years after the Closing date are attributable to the operation of Fee Properties prior to the Closing, and that Contaminants first detected more than two (2) years after the Closing date are not attributable to the operation of the Fee Properties prior to the Closing. The presumption that the Contaminants are attributable to the operation of the Fee Properties prior to the Closing may be successfully rebutted by a determination, by a preponderance of the evidence, by a third party consultant engaged by Seller, that the Contaminants are not attributable to the operation of the Fee Properties prior to the Closing date. Similarly, the presumption that the Contaminants are not attributable to the operation of the Fee Properties prior to the Closing may be successfully rebutted by a determination, by a preponderance of the evidence, by a third party consultant engaged by Buyer, that the Contaminants are attributable to the

operation of the Fee Properties prior to the Closing date. The method of selection of the environmental consultant will be as follows: If Seller wishes to rebut the rebuttable presumption, Seller may engage a consultant of its choice; if Buyer wishes to rebut the rebuttable presumption, Buyer may engage a consultant of its choice.

(c)     <u>Seller's Indemnification of Buyer</u>. Subject to the limitations contained herein Seller shall defend, indemnify and hold harmless Buyer from any Environmental Liability arising from or relating to an environmental condition existing or occurring on or prior to the Closing; *provided, however,* that Buyer shall notify Seller and seek input from Seller before incurring any expenses arising from any Environmental Liability except in the event of an emergency.

(i)     If Seller fails to discharge any or all of its environmental responsibilities under this Section 6.3, and if such failure continues for more than twenty (20) calendar days following written notice from Buyer to Seller, Buyer shall have the right, but not the obligation, to complete Seller's environmental responsibilities until they are fully discharged.

(ii)     If Buyer exercises its right to assume part or all of Seller's environmental responsibilities under this Section 6.3, Buyer shall be entitled to be reimbursed by Seller for any and all expenses incurred by Buyer in the performance of such responsibilities.

(iii)     Buyer shall have the right to collect such reimbursement by deducting the corresponding amounts from the monthly payments

otherwise due to be paid to Seller under the terms of the Promissory Note referenced in Section 2.3 and set forth in Exhibit F.

(d) <u>Buyer Responsibility</u>. Subject to the limitations set forth in this Agreement, Buyer shall be responsible for all liability and risk related to the Environmental Liability, directly or indirectly arising out of or related to the Assets and occurring after the Closing. This provision with respect to Environmental Liability constitutes a fundamental part of the bargain between Seller and Buyer.

(e) <u>Buyer's Indemnification of Seller</u>. Subject to the limitations contained herein, Buyer shall defend, indemnify, and hold harmless Seller from all claims, causes, of action, fines, penalties, losses, liabilities and expenses (including reasonable legal fees) which Seller may suffer because of the presence of Contaminants arising during Buyer's ownership or operation of the Assets after the Closing as indicated by the Baseline Data as defined below.

(f) <u>Commingling.</u> If, following the Closing date and while Seller is Remediating the Assets pursuant to Section 6.1 (b), there is a spill, leak or release or a suspected spill, leak or release ("New Release") of a Contaminant which impacts the Seller's remediation, Seller shall have no responsibility for the New Release. If there is a New Release, Buyer and Seller will mutually agree on an environmental consultant to make a determination as to (i) whether there is a New Release; (ii) if there is

a New Release, the type and quantity of Contaminants resulting from the New Release; and (iii) the increase in the cost of remediation due to the New Release. Buyer will assume the additional cost, responsibility and liability for the reporting requirements, emergency response actions, investigation and remediation of Contaminants in excess of the "Baseline Data" as set forth below. All reporting requirements, emergency response actions, investigation, monitoring or remediation of the New Release where it has not impacted Seller's remediation shall be the sole responsibility of the Buyer. If the New Release has impacted Seller's remediation, Buyer shall be responsible for any Contaminants above the Baseline Data and/or Seller's most recent available soil and groundwater analytical results. If the New Release represents less than 50% of the Contaminants present, as determined by the consultant, Seller shall have responsibility for the remediation of the New Release and Buyer shall reimburse Seller for its allocable share of the remediation costs. If the New Release represents greater than 50% of the Contaminants present, as determined by the consultant, Buyer shall assume responsibility for the remediation and have Seller reimburse Buyer for its allocable share of the remediation costs. Seller as set forth in the preceding sentence, or turning the remediation over to the Buyer and reimbursing the Buyer for only its allocable share of the remediation costs. In the event of any New Release which impacts Seller's remediation, Buyer shall have full

responsibility for all reporting requirements, emergency response actions and investigation of the New Release. Both Buyer and Seller agree to reimburse the other party for their respective allocable share of remediation costs within thirty (30) days of receipt of copies of original invoices for such costs.

(g)     "Baseline Data" means the Contaminants and their concentrations identified in the Environmental Assessment Report to be prepared pursuant to Paragraph 6.2 (a) of this Agreement.

6.4     Real Property Title Review.

(a)     Title Insurance Commitments. Within twenty one (21) calendar days following execution of this Agreement by both parties, Buyer shall secure title insurance commitments for the Fee Properties, which shall provide, upon recordation or filing of appropriate deeds, for the issuance of ALTA Form B title insurance policies insuring fee title to the Fee Properties to the Buyer or its assignees as provided herein, free and clear of all liens, encumbrances, defects in title and other matters of record except real estate taxes and assessments not then due and payable or such matters as are acceptable to Buyer. Buyer shall pay the cost of title examination and title insurance coverage in amounts Buyer may require. Buyer shall have seven (7) days after receipt to review said commitments. If Buyer, in its opinion, determines that there exists any exception to insurance coverage which is not reasonably acceptable, then Buyer shall notify Seller within such seven (7) day period of such exception. Any liens or encumbrances

or other instruments affecting title which are recorded after said seven (7) day period may be considered objections to title.

(b)   Defects in Title. Seller shall within seven (7) days following notification of any defect diligently endeavor to cure, or to make arrangements reasonably satisfactory to Buyer to cure, any such defect.

6.5   Buyer's Investigation; Due Diligence.   Buyer will have the right for twenty one (21) days ("Due Diligence Period") after Effective Date to inspect the Properties and the Business, review the contracts and agreements relating to the Properties and the Business, review the status of title to the Properties and to make such other inspections (including environmental), feasibility determinations, or other studies as Buyer determines. Based on the conclusions that Buyer derives during the Due Diligence Period, Buyer may notify Seller within said Due Diligence Period in writing of its intent not to close the proposed transaction it if is not satisfied in its sole and absolute discretion with any matter relating to the Properties or the Business, in which case neither party shall have any further liability to the other. Each party shall be fully responsible to pay for all costs of its due diligence activities.

6.6   Indemnification.

(a)   Survival. The representations, warranties, indemnities, covenants and other agreements herein set forth shall be deemed to be continuing and shall survive the Closing for three years.

(b)   Seller's Indemnification to Buyer. Seller shall indemnify and hold Buyer and its affiliates harmless from and against all claims, expenses (including

reasonable attorney's fees), losses and liabilities resulting from (i) any material breach by Seller of any of Seller's representations, warranties, and covenants set forth in this Agreement or instrument of conveyance delivered by Seller pursuant to this Agreement or (ii) any obligation or liability relating to the ownership or operation of the Assets prior to the Closing ("Loss" or "Losses"); *provided, however,* any obligation and liability that may arise as a result of environmental contamination and tanks ("Environmental Loss") shall be governed by Section 6.1, 6.2, 6.3 and 6.4 above.

(c)   <u>Buyer's Indemnification to Seller</u>. Buyer shall indemnify and hold Seller and its affiliates harmless from and against all claims, expenses (including reasonable attorneys' fees), losses and liabilities resulting from (i) any material breach by Buyer of any of Buyer's representations, warranties and covenants set forth in this Agreement or in any agreement or instrument delivered by Buyer pursuant to this Agreement or (ii) any obligation and liability relating to the ownership or operation of the Assets subsequent to the Closing; *provided, however,* that any obligation or liability that may arise as a result of environmental contamination and tanks shall be governed by Sections 6.1, 6.2 and 6.3 above.

(d)   <u>Notice of Claims</u>. The indemnified party shall give prompt written notice of any claim against it which may give rise to a claim against the indemnifying party under the foregoing indemnities and the indemnifying party shall undertake the defense, compromise or settlement of any such

matter. The indemnified party shall cooperate in and provide reasonable assistance with respect to any such defense, compromise or settlement. Failure to provide prompt notice of a claim as provided in this Section 6.8(d) shall constitute a waiver of the right to indemnification with respect to such claim to the extent the indemnifying party is prejudiced by the delay in providing such notification.

7.   **CONDITIONS PRECEDENT TO CLOSING.**

7.1   Seller's Conditions Precedent. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to each of the following conditions:

(a)   Representations and Warranties. The representations and warranties made by Buyer in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing. Seller shall have received from Buyer at the Closing satisfactory certificates to such effect signed by an authorized officer of Buyer.

(b)   Compliance. Buyer shall have performed and complied with all provisions of this Agreement required to be performed or complied with by Buyer prior to the Closing.

(c)   No Litigation. No action or proceeding by or before any governmental authority shall have been instituted (and not subsequently dismissed, settled or otherwise terminated), which might restrain, prohibit or invalidate any material portion of the transactions contemplated by this

Agreement.

(d) Guaranty.   Seller shall have received a personal guaranty from Mr. Kenneth C. Morrison in the form set forth in the attachment to the Promissory note in **Exhibit I**.

(e) Mortgage.   Seller shall have received a mortgage from Buyer on the two Fee Properties listed on **Exhibit A**.

(f) Exhibits. All of the Exhibits attached to this Agreement shall be completed to the mutual satisfaction of Buyer and Seller.

7.2   Buyer's Condition Precedent. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to each of the following conditions:

(a) Representations and Warranties. The representations and warranties made by Seller in this Agreement shall be true in all material respects when made and on and as of the date of the Closing as though such representations and warranties were made on and as of the Closing. Buyer shall have received from Seller at the Closing satisfactory certificates to such effect signed by an authorized officer of Seller.

(b) Compliance. Seller shall have performed and complied with all provisions of this Agreement required to be performed or complied with by Seller prior to the Closing.

(c) No Litigation. No action or proceeding by or before any governmental authority shall have been instituted (and not subsequently dismissed,

settled or otherwise terminated), which might restrain, prohibit or invalidate any material portion of the transactions contemplated by this Agreement.

(d) <u>Title Commitments</u>. A reputable title company acceptable to Buyer shall have issued to Buyer, at least seven (7) business days prior to the Closing, the commitments to issue owner's policies of title insurance referred to in Section 6.4 above.

(e) <u>Environmental Evaluations; Title Search; and Due Diligence</u>. The results of the Environmental Evaluations, title search and due diligence conducted in accordance with Sections 6.2, 6.4 and 6.6 shall be satisfactory to Buyer in its sole discretion; provided, if Buyer has not completed its Environmental Evaluations by the conclusion of the Due Diligence Period, Buyer may elect to waive this pre-condition and proceed to Closing, in which case Buyer and Seller agree that all of the provisions in Sections 6.1, 6.2 and 6.3 shall remain in full force and affect.

(f) <u>Robbinsville Lease</u>. The office lease for the Robbinsville office shall have been property assigned from Seller to Buyer with landlord approval, if required by the terms of the office lease.

(g) <u>Exhibits.</u> All of the Exhibits attached to this Agreement shall be completed to the mutual satisfaction of Buyer and Seller.

## 8. <u>MISCELLANEOUS.</u>

8.1 <u>Bulk Sales</u>. All debts, obligations and liabilities of Seller, including taxes, not expressly assumed pursuant to this Agreement with respect to the Business

shall be promptly paid and discharged by it as and when they become due and payable. Seller agrees to indemnify Buyer against and in respect of any and all loss, liability and damage sustained by Buyer as a result of the failure of Seller to pay and discharge as and when due any such debt, obligation or liability, including taxes, not assumed by Buyer. Seller further agrees that Buyer has the right to offset any damages or costs incurred against payments required to be paid to Seller under Section 2 above.

8.2 Payment of Expenses and Fees. Buyer and Seller shall each bear their own costs and expenses, except as may be otherwise provided in Section 6.1, 6.2 and 6.3 above, including but not limited to attorneys' fees incurred in connection with the transactions contemplated in this Agreement.

8.3 Publicity. Seller and Buyer shall jointly plan and coordinate all notices to third parties and all other publicity concerning the transactions contemplated by this Agreement. Seller and Buyer agree not to disclose the Purchase Price in such notices or publicity or otherwise.

8.4 Additional Assurances. From time to time at the request of Buyer, Seller shall execute and deliver, or cause to be executed and delivered, such instruments and documents and take such other action as Buyer may reasonably request to more effectively assign, transfer and convey to Buyer or its permitted assignees any of the Assets and to protect the right, title and interest of Buyer therein and the enjoyment by Buyer thereof and otherwise to carry out the intent of this Agreement. From time to time at the request of Seller, Buyer shall execute such further documents and instruments as Seller may

reasonably request to consummate or evidence the transactions contemplated by this Agreement or otherwise to carry out the intent of this Agreement.

8.5   <u>Assignment</u>. Neither Seller nor Buyer may assign rights or delegate duties hereunder without the prior written consent of the other party.

8.6   <u>Entire Agreement</u>. This Agreement, including the Exhibits and other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement between Seller and Buyer with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto. No amendment hereof shall be binding on the parties unless in writing and signed by authorized representatives of both parties. The headings used in this Agreement are for convenience of reference only and shall not be used to define the meaning of any provision.

8.7   <u>Severability</u>. The provisions of this Agreement shall be severable, and in the event any provision hereof shall be finally determined to be illegal or unenforceable, the remaining provisions shall remain in full force and effect. Any provision finally determined to be illegal or unenforceable may be reformed to make it legal and enforceable. The parties agree to negotiate in good faith any such reformation.

8.8   <u>Notices</u>. All notices and consents to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, telefaxed with confirmation of receipt, mailed by certified mail or delivered by a recognized commercial courier to the party at the address set forth above or such other address as any party shall have designated by 10 days' notice to the

other party at the address set forth in the preamble to this Agreement, together with a copy to counsel as follows:

| | |
|---|---|
| If to Seller: | [Name of Seller]<br>1 Union Street<br>Suite 208<br>Robbinsville, NJ 08691 |
| If to the Creightons: | Mr. and Mrs. Jan Creighton<br>1 Union Street<br>Suite 208<br>Robbinsville, NJ 08691 |
| With a copy to: | David R. Forrey, Esq.<br>Lewis & Morey, L.L.C.<br>34 Chambers Street<br>Princeton, NJ 08542 |
| If to Buyer: | Sycamore Energy, LLC<br>630 Skippack Pike<br>Blue Bell, PA 19422 |
| With a copy to: | David A. Feldheim, Esq.<br>600 W. Germantown Pike<br>Suite 400<br>Plymouth Meeting, PA 19462 |

8.9   No Third party Beneficiaries. This Agreement is not intended to and does not confer any rights or obligations on any party that is not a signatory to this Agreement.

8.10  Governing Law. This Agreement shall be interpreted in accordance with and governed by the law of the Commonwealth of Pennsylvania, without reference to principles of conflicts of laws.

8.11   Venue. Any action to enforce this Agreement, or to interpret or construe the meaning of this Agreement, shall be brought in the Federal District Court for the Eastern District of Pennsylvania, and Purchaser and Seller hereby expressly waive venue in any other Federal or State court.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Signatures on Next Page

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized signatories as of the date first above written.

KC OIL, INC.

By: _____

Print Name: _____

Title: _____

Date: _____


SYCAMORE PETROLEUM, LLC

By: _Kenith C. Morrison_

Print Name: _Kenneth C. Morrison_

Title: _President / CE_

Date: _11/14/2011_


GREENWOOD ENTERPRISES INC.

By: _____

Print Name: _____

Title: _____

Date: _____


BUCKS COUNTY PETROLEUM LLC

By: _____

Print Name: _____

Title: _____

Date: _____


TRENTON PETROLEUM INC.,

By: _____

Print Name: _____

Title: _____

Date: _____


CREIGHTON FAMILY PROPERTIES, LLC

By: _____

Print Name: _____

Title: _____

Date: _____


November 10, 2011                                  38

JAN CREIGHTON                           KIMBERLY CREIGHTON

_____                 _____

Date: _____           Date: _____

November 10, 2011                        39

# EXHIBIT A

## PROPERTY LIST

### PROPERTY LIST

| Station Name | Address | City | State | Zip |
|---|---|---|---|---|
| Hamilton Square Gasco | 2111 Route 33 | Hamilton | NJ | 08690 |
| Pennington Circle Gasco | 226 Route 31 South | Pennington | NJ | 08534 |

EXHIBIT B

PERSONAL PROPERTY

(Jason furnishes Depreciation List)

EXHIBIT C

VEHICLES

(To be furnished by KC)

EXHIBIT D

CUSTOMER LIST

(To be furnished by KC)

# EXHIBIT E

## ASSUMED LIABILITIES

(To be furnished by KC)

## EXHIBIT F

## DEED

(To be furnished by Sycamore)

EXHIBIT G

BILL OF SALE

(To be furnished by Sycamore)

EXHIBIT H

ADVANCE PAYMENT CALCULATION METHODOLOGY

(To be furnished by Sycamore)

# EXHIBIT I

## PROMISSORY NOTE

(To be furnished by Sycamore)

---

# EXHIBIT J

## SELLER'S DISCLOSURE STATEMENT

(To be furnished by KC)

11/16/2011  16:39  609-524-0182          Lewis&Forrey          #0487 P.001/001

JAN CREIGHTON

Date: 11-15-2011

KIMBERLY CREIGHTON

Date: NOV 15 2011

November 10, 2011                    39

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized signatories as of the date first above written.

KC OIL, INC.

By: _____

Print Name: _Ian J Creighton_

Title: _President_

Date: _11-14-11_


SYCAMORE PETROLEUM, LLC

By: _____

Print Name: _Kenneth C Manson_

Title: _President/CE_

Date: _11/14/2011_


GREENWOOD ENTERPRISES INC.

By: _____

Print Name: _Ian J Creighton_

Title: _President_

Date: _11-14-11_


BUCKS COUNTY PETROLEUM LLC

By: _____

Print Name: _Ian J Creighton_

Title: _President_

Date: _11-14-11_


TRENTON PETROLEUM INC.,

By: _____

Print Name: _Ian J Creighton_

Title: _President_

Date: _11-14-11_


CREIGHTON FAMILY PROPERTIES, LLC

By: _____

Print Name: _Ian J Creighton_

Title: _President_

Date: _11-14-11_

# EXHIBIT A

## REAL PROPERTIES

Hamilton Square Gasco
2111 Route 33
Hamilton, NJ 08690

Pennington Circle Gasco
226 Route 31
Pennington, NJ 08534

EXHIBIT B - PERSONAL PROPERTY

Case Excavator Cx47
Skid Steer
Snow Plow
Snow Plow
Snow Plow
Truck Radios

EXHIBIT C

## ENERGY DEAL 1-19-12

| TRUCK # | DESCRIPTION | VIN # | PLATE # | OLD PLATE # | LOAN HOLDER | AMOUNT |
|---|---|---|---|---|---|---|
| 302 | 2003 FREIGHTLINER OIL TRUCK | 1FVHBXAK92HH25366 | AL349W | AG349N | | |
| 303 | 2003 STERLING OIL TRUCK | 2FZACGAKX3AK90909 | AL361W | AG308S | | |
| 304 | 2010 GMC VAN | 1GT2GTBA4A1172670 | XS631A | | | |
| 305 | 1999 FORD BUCKET TRUCK | 1FDWF36SXXED13309 | XA239R | | ALLY | $25,111.50 |
| 306 | 2004 INTERNATIONAL OIL TRUCK | 1HTMKAAN54H671282 | AL357W | AH561G | | |
| 307 | 2004 GMC DUMP | 1GOJC1C44F512758 | XD488J | | | |
| 313 | 2005 FORD F350 | 1FDWF35P35EC57742 | XG824N | | | |
| 351 | 2004 FORD F350 | 1FTSF31P44EA35086 | XB690B | | | |
| 354 | 2001 FORD E250 VAN | 1FTNE24L91MA900078 | | | | |
| 355 | 1987 FORD PICK UP | 3FTHF36F7VMA55984 | XZ43WX | | | |
| 358 | 1996 FORD LN8000 OIL TRUCK | 1FDYK82E27VA04991 | AL347W | AG-491N | | |
| 360 | 1998 INTERNATIONAL OIL TRUCK | 1HTSDAMOWH535243 | AL358W | AG492N | | |
| 361 | 1995 INTERNATIONAL FLATBED | 1HTSCABM4SH658773 | XR289X | | | |
| 362 | 2002 FORD F450 - SMALL DUMP | 1FDX46F42ED04028 | X4894U | | | |
| JOEL | 2007 GMC ACADIA | 1GKER23768J168736 | WGV85J | | | |
| ANDREW | 2008 MAZDA CX7 | JM3ER29LX8018708 | YBM97Y | | | |
| | 2002 CAM TRAILER | 5JPBU233X2P005745 | T6TT1W | | | |
| 360 | 2004 EAGLE TRAILER | 112HAN30004L062806 | TAM49N | | | |
| 361 | 2010 KIA SOUL | KNDJT2A21A7085253 | XU190J | | KIA LOAN | |
| | 1960 Fru trailer | 1AVA438826 | | | | |
| | 2004 GMC DUMP TRUCK | 46D0CTC44F512758 | DAF | | | $6,519.63 |
| 308 | 1996 FRE TRT | 1FUYDZYBOTL793667 | | | | |

EXHIBIT D

CUSTOMER LIST

Delivered separately

DAF

KCM
1/31/12

## EXHIBIT E

## ASSUMED LIABILITIES

1.  Bank of Princeton Loan No. 2110141622 in the Original Amount of $73,481.50

2.  Bank of Princeton Loan No. 2110141622 in the Original Amount of $117,498.84

Exhibit F

**DAVID A. FELDHEIM**
Attorney at Law
Suite 400
600 W. Germantown Pike
Plymouth Meeting, PA 19462

———

Tel.: (610) 940-1640
Fax.: (610) 940-1641

Website: Feldheimlaw.com
E-mail: David@Feldheimlaw.com

February 16, 2012

Mr. Kenneth C. Morrison
President
Atlantis Petroleum, LLC
636 Skippack Pike
Blue Bell, PA 19422

<u>RE: 226 Route 31 South, Hopewell, NJ: Sycamore Fuels – JP I, LLC</u>

Dear Ken:

I have enclosed the Original Owner's Title Policy and recorded Deed for the captioned property.

Thank you.

Sincerely,

David A. Feldheim

# BRENNAN COMMERCIAL ABSTRACT, LLC

216 Haddon Avenue, Suite 400
Westmont, NJ 08108
Phone 856-240-1358 Fax 856-240-1958

February 14, 2012

David A. Feldheim, Esq.
600 W. Germantown Pike
Suite 400
Plymouth Meeting, PA  19462

Re:    Borrower:   Sycamore Fuels - JP I, LLC
        Property:    226 Route 31 South, Hopewell Township, NJ
        Our File #:  CA-6093

Gentlemen:

Enclosed is the following:

[ X ]   Original Owner's Policy and recorded Deed. - Please forward the originals to your
      client.

Please feel free to contact us with any questions you may have or if we can be of any
further assistance to you.

Sincerely,

BRENNAN COMMERCIAL ABSTRACT,
LLC

Karen Jones

Enclosure

'ercer County Clerk's Office

Return To:

    BRENNAN COMMERCIAL ABSTRACT
    216 HADDON AVE
    SUITE 400
    WESTMONT, NJ 08108

Index   DEEDS

Book   06139   Page   0281

No. Pages   0005

Instrument   REGULAR DEED

Date :   2/06/2012

Time :   9:17:26

Control #   201202060056

CREIGHTON PROPERTIES FAMILY

SYCAMORE FUELS-JP I

INST#          RD 2012 004392

Employee ID   KWISNIEW

Detail

| | | | |
|---|---|---|---|
| RECORDING | $ | 24.00 | |
| RECORDING | $ | 21.00 | |
| DD1 T1 CO | $ | 150.00 | |
| DD1 T1 PUB | $ | 75.00 | |
| DD1 T1 ST | $ | 375.00 | |
| DD1 T2 CO | $ | 50.00 | |
| DD1 T2 EX | $ | 60.00 | |
| DD1 T2 NPN | $ | 75.00 | |
| DD1 T2 PUB | $ | 25.00 | |
| All Other | $ | 933.00 | |
| Total: | $ | 1,788.00 | |

Consideration Amount $   300,000.00

RTF Standard Tier 1 $   600.00

RTF Standard Tier 2 $   335.00

RTF Standard Tier 3 $   780.00

Total          $   1,715.00

## HOPEWELL TOWNSHIP

Pursuant to Hopewell Township Ordinance Adopted 7/1/1996, please be advised that you must present a copy of the attached Deed, having been duly recorded in the Mercer County Clerk's Office, to the Hopewell Township Assessor's Office, Municipal Building 201 Washington Crossing-Pennington Road, Titusville New Jersey 08560 within 30 days, for the purpose of plotting on the Township Maps and to reflect change of ownership on Township records, along with the required fee of $45.00.

Mercer County Clerk's Office

# ___DEED___

This Deed is made on *January 31, 2012*

Record & Return
Brennan Commercial Abstract
216 Haddon Ave., Suite 400
Westmont, NJ 08108

## BETWEEN

**Creighton Properties Family Limited Partnership**

whose address is respectively, 1 Union Street, Suite 208, Robbinsville, New Jersey 08691 referred to as the Grantor,

## AND

**Sycamore Fuels – JP I, LLC.**

whose post office address is 630 Skippack Pike, Blue Bell, PA 19422, referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

1. *Transfer of Ownership.* The Grantor grants and conveys (transfers ownership of) the property (called the "Property") described below to the Grantee. This transfer is made for the sum of $300,000.00 **DOLLARS.** The Grantor acknowledges receipt of this money.

2. *Tax Map Reference.* (N.J.S.A. 46:15-1.1) Municipality of the Township of Hopewell Block No. 69 Lot 7

   ☐ No property tax identification number is available on the date of this Deed. (Check box if applicable.)

3. *Property.* The property consists of the land and all the buildings and structures on the land in the Township of Hopewell, County of Mercer and State of New Jersey. The legal description is:

   ☐ Please see attached Legal Description annexed hereto and made a part hereof. (Check box if applicable).

BEING the same premises conveyed to the Grantor(s) herein by Deed from BP Products of North America Inc., to Creighton Properties Family Limited Partnership dated October 11, 2001 and recorded in the Mercer County Clerk's Office on November 5, 2001 in Deed Book 4165 Page 24.

| Prepared by: (print signer's name below signature.) | (For Recorder's Use Only) |
|---|---|
| *David Torrey* | BOOK 3 9 PAGE 2 8 2 |

226 Rt 31 South, Hopewell New Jersey

4.   *Promises by Grantor.* The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

5.   *Signatures.* The Grantor signs this Deed as of the date at the top of the first page. (Print name below each signature.)

CREIGHTON PROPERTIES FAMILY
LIMITED PARTNERSHIP

**WITNESSED BY:**

_____

In compliance with the statute I have presented an abstract of the within to the Assessor of the taxing district therein mentioned.
PAULA SOLLAMI-COVELLO
MERCER COUNTY CLERK

*** BY        (Seal) JAN CREIGHTON
GENERAL PARTNER

_____
***            (Seal)

**STATE OF NEW JERSEY, COUNTY OF MERCER: SS**

I CERTIFY that on January 31     JAN CREIGHTON, GENERAL PARTNER
20, ***                          , personally came before me and stated to my satisfaction that this person (or if more than one, each person):
   (a) was the maker of the attached deed;
   (b) executed this deed as his or her own act; and,
   (c) made this Deed for ____$300,000.____ and other good and valuable consideration as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined in N.J.S.A. 46:15-5.)

ANNE CARITE WARCHOL
Notary Public of New Jersey
My Commission Expires
October 17, 2013

**RECORD AND RETURN TO:**

***

Record & Return
Brennan Commercial Abstract
216 Haddon Ave., Suite 400
Westmont, NJ 08108

VOL 6 1 3 9 PAGE 2 8 3

CA-6093



Schedule A (Continued)
ALTA Plain Language Commitment 2006

File No. **CA-6093**

### LEGAL DESCRIPTION

ALL that certain lot, parcel or tract of land, situate and lying in the Township of Hopewell, County of Mercer, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point in the Northerly line of the Washington Crossing-Pennington Road (60 feet wide), said point being the Southwesterly end of the curve having a radius of 70 feet that connects the said line of Washington Crossing-Pennington Road with the Westerly line of New Jersey State Highway Route 31 (variable width), and running thence

    (1)    South 81 degrees 53 minutes 38 seconds West, along the Northerly line of the Washington Crossing-Pennington Road, 82 feet to a point; thence

    (2)    North 08 degrees 06 minutes 30 seconds West, 100 feet to a point; thence

    (3)    North 20 degrees 24 minutes 09 seconds East, 116.98 feet to a point; thence

    (4)    North 83 degrees 33 minutes 06 seconds East, 100 feet to a point in the aforesaid Westerly line of New Jersey State Highway Route 31; thence

    (5)    South 06 degrees 26 minutes 54 seconds East, along the Westerly line of New Jersey State Highway Route 31, 132 feet to a point; thence

    (6)    Southwesterly along the aforesaid curve bearing to the right having a radius of 70 feet that connects the said line of Washington Crossing-Pennington Road with the Westerly line of New Jersey State Highway Route 31, an arc distance of 107.93 feet to the point and place of beginning.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 7 in Block 69 on the Township of Hopewell Tax Map.

GIT/REP-3
(6-10)



### State of New Jersey
## SELLER'S RESIDENCY CERTIFICATION/EXEMPTION
(C.55, P.L. 2004)

(Please Print or Type)

## SELLER(S) INFORMATION (See Instructions, Page 2)

Name(s)

**Creighton Properties Family Limited Partnership, a Delaware Limited Partnership**

Current Resident Address:

Street: 1 Union Street Suite 208

| City, Town, Post Office | State | Zip Code |
|---|---|---|
| Robbinsville | NJ | 08691 |

## PROPERTY INFORMATION (Brief Property Description)

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 69 | 7 | |

Street Address:

**226 Route 31 South**

| City, Town, Post Office | State | Zip Code |
|---|---|---|
| Hopewell | NJ | |

| Seller's Percentage of Ownership | Consideration | Closing Date |
|---|---|---|
| 100 | 300,000.00 | 1/31/12 |

## SELLER ASSURANCES (Check the Appropriate Box)  (Boxes 2 through 8 apply to Residents and Non-residents)

1. ☐   I am a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to N.J.S.A. 54A:1-1 et seq. and will file a resident gross income tax return and pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐   The real property being sold or transferred is used exclusively as my principal residence within the meaning of section 121 of the federal Internal Revenue Code of 1986, 26 U.S.C. s. 121.

3. ☐   I am a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐   Seller, transferor or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☒   Seller is not an individual, estate or trust and as such not required to make an estimated payment pursuant to N.J.S.A.54A:1-1 et seq.

6. ☐   The total consideration for the property is $1,000 or less and as such, the seller is not required to make an estimated payment pursuant to N.J.S.A. 54A:5-1-1 et seq.

7. ☐   The gain from the sale will not be recognized for Federal income tax purposes under I.R.C. Section 721, 1031, 1033 or is a cemetery plot. (CIRCLE THE APPLICABLE SECTION).  If such section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey income tax return for the year of the sale (see instructions).

    ☐   No non-like kind property received.

8. ☐   Transfer by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this state.

## SELLER(S) DECLARATION

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein could be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete.  By checking this box ☐ I certify that the Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached.

| | |
|---|---|
| **January 31, 2012** | ~~END OF DOCUMENT~~ |
| Date | Signature |
| | (Seller) Please indicate if Power of Attorney or Attorney in Fact |

VOL 6139 PAGE 285

| | |
|---|---|
| Date | Signature |
| | (Seller) Please indicate if Power of Attorney or Attorney in Fact |

# OWNER'S POLICY OF TITLE INSURANCE

Policy Issuer:
**BRENNAN COMMERCIAL ABSTRACT, LLC**
**216 HADDON AVENUE,**
**SUITE 400**
**WESTMONT, NJ 08108**
**PHONE: 856-240-1953**



Policy Number **OX-08547266**     File Number: **CA-6093**

Issued by Old Republic National Title Insurance Company

**Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.**

## COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, a Minnesota corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.

2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from:
   (a) A defect in the Title caused by
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3. Unmarketable Title.

4. No right of access to and from the Land.

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

Countersigned:

_____
Authorized Officer or Licensed Agent

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
*A Stock Company*
*400 Second Avenue South, Minneapolis, Minnesota 55401*
*(612) 371-1111*

By _____    President

Attest _____    Secretary

ORT Form 4309
ALTA Owners Policy of Title Insurance 6-17-06

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective

    (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

    (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

        (i) to be timely, or

        (ii) to impart notice of its existence to a purchaser for value or to a

        judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.     (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

        (i) the occupancy, use, or enjoyment of the Land;

        (ii) the character, dimensions, or location of any improvement erected on the Land;

        (iii) the subdivision of land; or

        (iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

# CONDITIONS AND STIPULATIONS

## 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 11 and 12 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d) "Insured": The Insured named in Schedule A.

(i) The term "Insured" also includes

(A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;

(B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

(C) successors to an Insured by its conversion to another kind of Entity;

(D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

(1) if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2) if the grantee wholly owns the named Insured,

(3) if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or

(4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

(ii) With regard to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

(e) "Insured Claimant": An Insured claiming loss or damage.

(f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(j) "Title": The estate or interest described in Schedule A.

(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

## 4. PROOF OF LOSS

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

## 5. DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.



**SCHEDULE A**

Name and Address of the Title Insurance Company:
**Old Republic National Title Insurance Company**
400 Second Avenue South
Minneapolis, Minnesota 55401

File No.: CA-6093                                Policy No.: OX-08547266

Address Reference: 226 Route 31 South, Township of Hopewell, NJ

Amount of Insurance: $300,000.00               Premium: $ 1,315.00

Policy Date: **February 6, 2012**

1.  Name of Insured:

    **Sycamore Fuels – JP I, LLC**

2.  The estate or interest in the Land that is insured by this Policy is:

    **Fee Simple**

3.  Title is vested in:

    **Sycamore Fuels – JP I, LLC by virtue of a deed from Creighton Properties Family Limited Partnership, dated January 31, 2012, and recorded February 6, 2012, in the Clerk's Office for the County of Mercer, in Book 6139, at page 281, as Instrument No. RD2012004392.**

4.  The Land referred to in this policy is described as follows:

    Located in: **Township of Hopewell, Mercer County, New Jersey**

    **See Schedule A continued for Legal Description**

BRENNAN COMMERCIAL ABSTRACT, LLC

Countersigned: _____          Issued at:
                                                 **216 Haddon Avenue**
          Authorized Officer or Agent            **Suite 400**
                                                 **Westmont, NJ 08108**

ALTA Owner's Policy (6/17/06)                    NJRB 1-15
Schedule A                                       Effective: 2/15/07
                                                 Revised: 9/10/07



SCHEDULE A
(continued)

File No.: **CA-6093**                                                    Policy No.: ox-08547266

## LEGAL DESCRIPTION

ALL that certain lot, parcel or tract of land, situate and lying in the Township of Hopewell, County of Mercer, State of New Jersey, and being more particularly described as follows:

BEGINNING at a point in the Northerly line of the Washington Crossing-Pennington Road (60 feet wide), said point being the Southwesterly end of the curve having a radius of 70 feet that connects the said line of Washington Crossing-Pennington Road with the Westerly line of New Jersey State Highway Route 31 (variable width), and running thence

(1)     South 81 degrees 53 minutes 38 seconds West, along the Northerly line of the Washington Crossing-Pennington Road, 82 feet to a point; thence

(2)     North 08 degrees 06 minutes 30 seconds West, 100 feet to a point; thence

(3)     North 20 degrees 24 minutes 09 seconds East, 116.98 feet to a point; thence

(4)     North 83 degrees 33 minutes 06 seconds East, 100 feet to a point in the aforesaid Westerly line of New Jersey State Highway Route 31; thence

(5)     South 06 degrees 26 minutes 54 seconds East, along the Westerly line of New Jersey State Highway Route 31, 132 feet to a point; thence

(6)     Southwesterly along the aforesaid curve bearing to the right having a radius of 70 feet that connects the said line of Washington Crossing-Pennington Road with the Westerly line of New Jersey State Highway Route 31, an arc distance of 107.93 feet to the point and place of beginning.

FOR INFORMATIONAL PURPOSES ONLY: Also known as Lot 7 in Block 69 on the Township of Hopewell Tax Map.



## SCHEDULE B

### EXCEPTIONS FROM COVERAGE

File No.: **CA-6093**                                                                Policy No.: ox-08547266

Notwithstanding any provision of the policy to the contrary, the following matters are expressly excepted from the coverage of the policy, and the Company will not pay loss or damage, costs, attorney's fees or expenses that arise by reason of:

1.   Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. (For an additional charge and upon submission of an acceptable survey, this exception will be deleted by endorsement and the policy will set forth those matters, if any, affecting title.)

2.   The Policy does not insure acreage and quantity of land.

3.   Subsurface conditions and/or encroachments not disclosed by an instrument of record.

4.   Taxes paid through March 31, 2012; Sewer paid through July 1, 2012.

5.   Possible additional taxes and assessments assessed or levied under N.J.S.A.  54:4-63.1 et seq.

6.   Slope and drainage rights of the State of New Jersey as in Book 733, page 64.

7.   Restrictions as contained in Book 4165, page 23.

## Endorsement



Attached to Policy No. __OX-08547266__

Issued By

Old Republic National Title Insurance Company

File No.: CA-6093

Exception No. __1__ is removed. Notwithstanding any provision in the policy to the contrary, unless an exception is taken in Schedule B, the policy insures against loss arising from any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title. The following matters shown on a survey made by **Stout & Caldwell**, dated **11/01/2011**, are added to Schedule B:

This policy does not insure against errors or inaccuracies in the survey with respect to matters which do not affect title.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Issued through the Office of:

Brennan Commercial Abstract, LLC

_____
Authorized Signature

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
*A Stock Company*
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____ President

Attest _____ Secretary

SURVEY ENDORSEMENT

NJRB 5-01
Effective: 10/20/75
Last Revised: 9/10/07

CONDITIONS AND STIPULATIONS (con't)

**11: LIABILITY NONCUMULATIVE**

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

**12. PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT.**

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

**14. ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**16. SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**17. CHOICE OF LAW; FORUM**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**18. NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at 400 Second Avenue South, Minneapolis, Minnesota 55401-2499.

CONDITIONS AND STIPULATIONS (con't)

6. **DUTY OF INSURED CLAIMANT TO COOPERATE**

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7. **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.
To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this

policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8. **DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of

(i) the Amount of Insurance; or

(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9. **LIMITATION OF LIABILITY**

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10. **REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

Exhibit C

## BILL OF SALE

THIS BILL OF SALE from KC OIL, INC., GREENWOOD ENTERPRISES INC., BUCKS COUNTY PETROLEUM LLC, TRENTON PETROLEUM INC., CREIGHTON FAMILY PROPERTIES, LLC and JAN & KIMBERLY CREIGHTON, with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691(individually and collectively the "Seller" or "Sellers"), to Sycamore Energy-KC Oil, LLC, a Pennsylvania limited liability company ("Purchaser"), is dated  January 31, 2011 and provides as follows:

WITNESSETH:

WHEREAS, Sellers and Purchaser are parties to a certain Agreement of Sale dated November 14, 2011, as amended by a First Amendment to Asset Purchase Agreement dated December 22, 2011 and a Second Amendment to Asset Purchase Agreement dated January 31, 2012 (, the Asset Purchase Agreement, as amended, the "Purchase Agreement"), pursuant to which Sellers have agreed to sell to Purchaser, and Purchaser has agreed to purchase from Sellers, certain assets of the Seller, including the personal property listed in Exhibit B and the vehicles listed in Exhibit C of the Purchase Agreement ("Property") on the terms and conditions set forth therein; and

WHEREAS, capitalized terms used herein shall have the same meaning as in the Purchase Agreement unless defined herein.

NOW, THEREFORE, pursuant to the terms and conditions of the Purchase Agreement, Sellers, for valuable consideration paid to it by Purchaser, the receipt, adequacy and sufficiency of which is hereby acknowledged, have granted, bargained, sold, assigned, transferred, set over and delivered, and by these presents do hereby grant, bargain, sell, assign, transfer, set over and deliver, unto Purchaser, its successors and assigns, all of Sellers' right, title and interest in and to the Property as the same shall exist as of the date hereof.

TO HAVE AND TO HOLD the same unto Purchaser and its successors and assigns forever free and clear of all tax claims, liens, security interests and encumbrances of every kind, nature and description.

This Bill of Sale is subject in all respects to the terms of the Purchase Agreement, and all of the representations, warranties, covenants, and agreements contained in the Purchase Agreement which shall survive the execution and delivery of this Bill of Sale according to the terms of the Purchase Agreement.

...................................................................................................
...................................................................................................

### SIGNATURES ON NEXT PAGE

IN WITNESS WHEREOF, this Bill of Sale has been duly executed as of the date set forth above.

**SELLER:  KC OIL, INC.**

By: _____

PRINT NAME: _____


**SELLER:  GREENWOOD ENTERPRISES, INC.**

By: _____

PRINT NAME: _____


**SELLER:  BUCKS COUNTY PETROLEUM, LLC**

By: _____

PRINT NAME: _____


**TRENTON PETROLEUM, LLC**

By: _____

PRINT NAME: _____


**CREIGHTON PROPERTIES, FAMILY LIMITED PARTNERSHIP**

By: _____

PRINT NAME: _____

SELLER: JAN AND  KIMBERLY CREIGHTON

_____

JAN CREIGHTON

_____

KIMBERLY CREIGHTON

BUYER:   SYCAMORE ENERGY-KC OIL, LLC

By: _____

PRINT NAME: _____

Exhibit · H

| TRUCK ENDING INVENTORY 1/30/12 | | | |
|---|---|---|---|
| TRUCK | GAL | PRICE/GAL | TOTAL |
| 303 | 236.9 | 3.1902 | $ 755.76 |
| 306 | 968.8 | 3.1902 | $ 3,090.67 |
| 358 | 1,908.0 | 3.1902 | $ 6,086.90 |
| 360 | 296.2 | 3.1902 | $ 944.94 |
| | | | $ 10,878.26 |

306    1750 · ~~3.1902~~
              × 3.1717 ~~ 5550.48
                        16,428.74

Service  Interests · 29,045⁰⁰
   oil           16,428.74
               12,616.26
Tank Ins.       1470.⁰⁰
               11,146.26  Credit

129,998.57 AR
 11,146.26
118,852.31
  K owes J

[ conformed copy ]

## PROMISSORY NOTE

$1,000,000                                          Pennington, New Jersey

January 31, 2012 ("Effective Date")

FOR VALUE RECEIVED, the undersigned, Sycamore Energy-KC Oil, LLC (the "Maker"), pursuant to the terms of an Asset Purchase Agreement, as amended by the First Amendment to Asset Purchase Agreement dated December 22, 2011 and the Second Amendment to Asset Purchase Agreement dated January 31, 2012 (the Asset Purchase Agreement, as amended, hereinafter referred to as the "Purchase Agreement") entered into between Maker and KC Oil, Inc. (the "Payee"), hereby promises to pay to Payee the principal sum of One Million Dollars ($1,000,000) together with interest on the unpaid principal balance from the Effective Date until paid at the annual rate of six percent (6%), calculated in accordance with a ten year amortization rate.

1.   Payment Terms.   The principal and interest shall be payable in One Hundred Twenty (120) monthly installments of principal and interest, amortized over a ten year period. Maker agrees to make One Hundred Twenty (120) equal monthly payments, calculated in the amount of Eleven Thousand One Hundred Two Dollars and Five Cents ($11,102.05) each, the payment due and payable by electronic wire transfer beginning on the first day of each calendar month following the date of this Note and on the first day of each calendar month thereafter.

2.   Prepayment.   The Maker may prepay principal at any time in whole or in part without penalty or notice; provided, however, that any such prepayment shall be applied first to pay all accrued interest and thereafter to principal.

3.   Events of Default.   Each of the following shall constitute an "Event of Default" hereunder:

(a)   Failure of the Maker to make any payment of principal or interest when due after the Payee has given the Maker written notice of the delinquency, and said delinquency continues for fifteen (15) days after the giving of such notice;

(b)   Application for or consent to the appointment of a receiver, trustee or liquidator by Maker for its assets;

(c)   Admission in writing by Maker of its inability to pay debts as they mature;

(d)   The making of a general assignment for the benefit of creditors by Maker;

(e)   Adjudication that Maker is bankrupt or insolvent;

(f)    Filing by Maker of (i) a voluntary petition in bankruptcy; or (ii) a petition or an answer seeking reorganization or an arrangement with creditors, or to take advantage of any insolvency, readjustment of loan, dissolution or liquidation law or statute; or (iii) an answer admitting the material allegations of a petition filed against Maker in any proceeding under such law; or

(g)    The entering of an order, judgment or decree, without the application, approval or consent of Maker by any court of competent jurisdiction, appointing a receiver, trustee or liquidator for Maker, if such order, judgment or decree shall continue unstayed and in effect for a period of sixty (60) days.

4.    <u>Consequence of Default</u>.  Upon the occurrence of an Event of Default, the Payee may, at the Payee's sole election and without prior notice to Maker, declare the entire unpaid balance of principal under this Note and interest thereon to be immediately due and payable.

5.    <u>Set-Off</u>.  Maker has the right to off-set amounts due under the Note against (a) liabilities of Payee arising from Payee's failure to pay New Jersey taxes, including interest, penalties, and (b) expenses incurred by Maker in defending claims made against Maker by the State of New Jersey arising from Payee's failure to pay such taxes.

6.    <u>Waiver</u>.  Except for notices expressly required herein, the Maker waives presentment for payment, demand, notice of dishonor, protest and notice of protest of this Note and all other notices in connection with delivery, acceptance, performance, default or enforcement of the payment of this Note.  Liability hereunder shall be unconditional and shall not be affected in any manner by an indulgence, extension of time, renewal, waiver or modification granted or consented to by Payee.

7.    <u>Notices and Payments</u>.

(a)    All notices hereunder must be written.  Notices to the Maker shall be deemed to be given when hand-delivered with a receipt, or mailed certified mail, postage prepaid and return receipt requested, and addressed to Maker at 630 Skippack Pike, Blue Bell, PA 19422, or to such other person or address as the Maker shall from time to time designate by notice to the Payee at the address at which payments hereunder are directed to be made.

(b)    Payments of principal and interest shall be made to the Payee electronically by Payee drafting from Maker's bank account beginning on the first day of the first calendar month following the date of this Note and on the first day of each calendar month thereafter until paid in full.

(c)    Any payments or notices required herein which pursuant to the terms of this Note shall be due on a Saturday, Sunday or federal government holiday shall be considered timely if given or made on the next succeeding business day.

8.    <u>Late Fee</u>.  If any payment or installment of interest or principal due hereunder is not paid within ten (10) days after the same becomes due (without reference

to any grace or cure periods set forth herein), then Maker shall pay to Payee a late charge in an amount equal to five percent of the overdue sum, in order to reimburse Payee for the costs and expenses of handling such delinquent payment.  Neither the imposition nor the collection of such late charge shall constitute Payee's waiver of any default or Event of Default of Maker hereunder, and shall be in addition to and not in lieu of any other rights and remedies which may be available to Payee hereunder.  Such late charge, if not paid by Maker, shall, at the option of Payee, be added to and become part of the outstanding principal balance of this Note.

      9.    <u>Governing Law</u>.  This Note shall be governed by the laws of the State of New Jersey, without giving effect to the principles of conflict of laws.

      10.    <u>Guaranty</u>.    This Note shall be guaranteed by Kenneth C. Morrison pursuant to the terms of the Guaranty attached hereto.

      IN WITNESS WHEREOF, and intending to be legally bound, the Maker has duly executed this Note on the day and year first above written.

ATTEST:                              **SYCAMORE ENERGY- KC OIL, LLC**

 

By: _____

 

                                 _____
                                 Print

 

Date: _____

## ATTACHMENT 1 TO PROMISSORY NOTE

## GUARANTY

For value received, the undersigned unconditionally guarantees to **KC Oil, Inc.**, a New Jersey corporation (the "Payee"), the payment of all funds owed by **Sycamore Energy-KC Oil, LLC** ("Maker") to Payee as provided in that certain Promissory Note dated as of  January 31, 2012, amounts owed by Maker to Payee pursuant to Maker's purchase of certain assets from Payee under the terms of an Asset Purchase Agreement, dated November 14, 2011, as amended by a First Amendment to Asset Purchase Agreement dated December 22, 2011 and a Second Amendment to Asset Purchase Agreement dated January 30, 2012.

Any default by Maker in making any payment owed to Payee under the Promissory Note shall oblige the undersigned to pay all damages, costs and reasonable expenses that Payee may incur or be awarded from Maker by reason of such default.

This Guaranty by the undersigned is unconditional and Payee need not exhaust its remedies against, or seek relief or satisfaction from, Maker prior to exercising such remedies or seeking such relief or satisfaction from the undersigned.

This Guaranty shall be binding on the undersigned and on his legal representatives and assigns.

Executed this 31st day of January, 2012.

_____

**KENNETH C. MORRISON**

Exhibit J

## SELLER'S DISLCOSURE STATEMENT

Pursuant to the terms of the Asset Purchase Agreement regarding 12 Service Stations, entered into among BUCKS COUNTY PETROLEUM LLC, CREIGHTON PROPERTIES FAMILY LIMITED PARTNERSHIP, TRENTON PETROLEUM, INC. GREENWOOD ENTERPRISES, INC., K. C. OIL, INC. JAN CREIGHTON, KIMBERLY CREIGHTON with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691, ("Seller"), and SYCAMORE ENERGY-K.C. OIL., LLC, a Pennsylvania limited liability company with its principal place of business at 630 Skippack Pike, Blue Bell, PA 19422, ("Buyer") dated as of November 14, 2011, as amended by the First Amendment to Asset Purchase Agreement dated December 22, 2011 and the Second Amendment to Asset Purchase Agreement dated January 30 2012 (the "Agreement"), the Seller hereby certifies that:

(a) The representations and warranties made by Seller in the Agreement are true in all material respects when made and on and as of the date hereof; and

(b) The Seller has nothing to disclose to the Buyer since the Agreement was signed by the parties which would materially and adversely affect Buyer's ability to own or operate the Properties.

Executed this 30th day of January, 2012

Bucks County Petroleum LLC.,

By: _____
    Jan Creighton, President

Creighton Properties Family Limited Partnership

By: _____
    Jan Creighton, General Partner

Greenwood Enterprises, Inc

By: _____
    Jan Creighton, President

K. C. Oil, Inc.

By: _____
    Jan Creighton, President

_____
Jan Creighton

_____
Kimberly Creighton

# EXHIBIT D

## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT
### (2)

This Second Amendment To Asset Purchase Agreement ("Amendment") is made effective as of the 31st day of January, 2012 ("Effective Date"), by and among SYCAMORE ENERGY, LLC, a Pennsylvania limited liability company with its principal place of business at 630 Skippack Pike, Blue Bell, PA 19422 or its designee, ("Buyer"), and KC OIL, INC., GREENWOOD ENTERPRISES INC., BUCKS COUNTY PETROLEUM LLC, TRENTON PETROLEUM INC., CREIGHTON FAMILY PROPERTIES, LLC and JAN & KIMBERLY CREIGHTON, with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691 (individually and collectively the "Seller" or "Sellers"), all of whom hereby agree as follows:

### WITNESSETH:

WHEREAS, the parties entered into an Asset Purchase Agreement dated as of November 14, 2011, ("Asset Purchase Agreement") for Purchaser's purchase of a heating oil company and the two (2) properties described in Exhibit A to the Agreement (the "Properties"); and

WHEREAS, the parties have amended the Asset Purchase Agreement by a First Amendment to Asset Purchase Agreement dated as of December 22, 2011 ("Amendment"); and

WHEREAS, the parties now wish to further amend the Agreement as amended by the Amendment to make certain changes and additions as set forth in this Second Amendment to Asset Purchase Agreement (the Asset Purchase Agreement, as amended by the Amendment and this Second Amendment, hereinafter referred to as the "Agreement").

1

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein and intending to be legally bound hereby, the parties agree as follows:

1.    **New Terms.**    The parties agree to the following additional terms and conditions:

1.1    **Vehicle and Equipment Loans.** The parties have determined that several of the vehicles and items of equipment to be transferred from Seller to Buyer are encumbered by Loans, and the parties have agreed to the following terms and conditions:

1.1.1 The loan from ALLY in the amount of $24,609.27 will be paid off by Seller; Seller will deliver clear title to the vehicles encumbered by the loan; and Buyer will give Seller a Promissory Note in said amount to be paid by Seller in accordance with the terms set forth in the Promissory Note, whose payment term shall not exceed the remaining term of the ALLY Loan.

1.1.2    The loan from KIA Motors in the amount of $6028.12 will be paid off by Seller; Seller will deliver clear title to the vehicles encumbered by the loan; and Buyer will give Seller a Promissory Note in said amount to be paid by Seller in accordance with the terms set forth in the Promissory Note, whose payment term shall not exceed the remaining term of the KIA Motors Loan.

1.1.3    The loan from PNC, whose payoff was $63,592.12 as of January 20, 2012 plus a per diem of $7.90, shall be paid off in full by Seller; Seller will deliver clear title to equipment encumbered by the loan; Buyer and Seller have agreed that Buyer will accept responsibility for half of the final payoff as of

January 30, 2012, i.e. $32.339.64, and Buyer will give Seller a Promissory Note for $32,339.64 to be paid by Seller in accordance with the terms set forth in the Promissory Note, whose term shall not exceed the remaining term of the PNC Loan.

1.2     **Set-Off.**  The parties have agreed that, because there is no cash proceeds from this transaction and the parties are not able to place Three Hundred Thousand Four Hundred Dollars ($300,400) of the Purchase Price in escrow, as recommended by the New Jersey Department of Revenue, Bulks Sales Section, Buyer shall have a right of set-off against the One Million Dollar ($1,000,000) Note to reimburse Buyer for its losses due to (a) liabilities of Seller arising from Seller's failure to pay New Jersey taxes, including interest, penalties, and (b) expenses incurred by Buyer in defending claims made against Seller by the State of New Jersey arising from Seller's failure to pay such taxes; provided, such right of set-off shall terminate upon Buyer's receipt of a Tax Clearance Certificate from the State of New Jersey for each of the corporate Sellers..

1.3     **Inventory; Operations.** The Buyer has agreed to pay for the Inventory in the heating oil delivery trucks and the calculation of the amount owed by Buyer to Seller for the Inventory will be made in two steps, i.e., (1) representatives of Buyer and Seller shall take inventory in these trucks as of Midnight before the Closing scheduled for Tuesday, January 31, 2012; and (2) the amount to be paid by Buyer for such Inventory at the Closing shall be calculated by matching the Inventory against the last load delivered price. All sales shall be for Buyer's account starting at 12:01 a.m. on Tuesday, January 31, 2012.

3

1.4     **Account Receivables.** Seller and Buyer have agreed that Buyer will purchase Seller's current accounts receivable, i.e., receivables that are due no more than sixty (60) days from their billing date, for the face value of such accounts; provided that (a) Seller furnishes Buyer with accurate written records of the amounts owed and by whom no later than the Closing; and (b) payment shall be made by Buyer to Seller for such current accounts receivable promptly following Buyer's receipt of such payments. Seller shall retain the right and responsibility to collect all accounts receivable due more than sixty (60) days. All amounts received by Buyer shall be applied first to receivables for which Buyer has agreed to pay Seller as provided herein.

1.5     **Sales.** The Seller represents and warrants that the heating oil sales volumes depicted in the Exhibit A to this Second Amendment are true and complete.

1.6     **Supply Relationship.** Seller has agreed, for a forty five (45) day period ending March 16, 2012, to maintain Seller's supply contracts and relationships with existing fuel suppliers, including any and all guaranties in place to secure such purchases, to afford Buyer time to establish its own independent contractual and credit relationships with these fuel suppliers; provided, during this forty five day period (a) Seller shall purchase fuel where and when instructed by Buyer for pickup by Buyer; Buyer will take delivery of the purchased fuel; Buyer will pay Seller for such fuel within seven (7) days of each pickup; and (b) Buyer will secure a Letter of Credit for the benefit of Jan Creighton and Seller in the

4

amount of Five Hundred Thousand Dollars ($500,000) for a term of sixty (60) days.

      1.7    Seller will pay off the outstanding balance owed on a loan incurred for Seller's purchase of a Skid Loader and will arrange for the lender's prompt removal of the lien filed against the Skid Loader to secure such loan.

2.    **Terms & Conditions.**  It is expressly understood and agreed that the remaining terms and conditions set forth in the Agreement, as amended by the First Amendment, shall be and remain in full force and effect in all respects.

3.    **Execution.**  This Amendment may be executed in several counterparts, each of which shall be deemed an original, and as executed shall constitute a single Amendment binding on all parties hereto, notwithstanding that all the parties are not signatory to the same counterpart. However this document shall not be binding on or constitute evidence of a contract between the parties until such time as a counterpart of this document has been executed by each and every party.

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be executed by their duly authorized signatories as of the date first above written.

KC OIL, Inc

SYCAMORE ENERGY, LLC

By: _____

Print Name: _Jim Caughton_____

Title: _Pres_____

Date: _1-31-12_____

SYCAMORE ENERGY, LLC

KC OIL, INC.

By: _Kenneth C. Thomas_____

Print Name: _____

Title: _____

Date: _1-31-12_____

5

**GREENWOOD ENTERPRISES INC.**

By: _____

Print Name: _____

Title: _____

Date: _1- 31·12_____

**BUCKS COUNTY PETROLEUM LLC**

By: _____

Print Name: _____

Title: _____

Date: _1- 31·12_____

**TRENTON PETROLEUM, INC.**

By: _____

Print Name: _____

Title: _____

Date: _1-31-12_____

**CREIGHTON FAMILY PROPERTIES, LLC**

By: _____

Print Name: _____

Title: _____

Date: _1- 31·12_____

**JAN CREIGHTON**

_____

Date: _1-31·12_____

**KIMBERLY CREIGHTON**

_____

Date: _1-31-2012_____

6

*Exhibit A to Second Amendment*

### 1/1/2008 TO 12/31/2008

| TERMINAL | PRODUCT | GALLONS |
|---|---|---|
| CONSUMERS | #2 HEAT | 365,108 |
| DUCK ISLAND | #2 HEAT | 251,227 |
| DUCK ISLAND | ULSD | 396,673 |
| DUCK ISLAND | ULSD DYED | 12,710 |
| DUCK ISLAND | ULSD PREM | 135,955 |
| SPRAGUE | #2 HEAT | 418,077 |
| SPRAGUE | ULSD | 269,262 |
| GULF | ULSD | 82,006 |
| HESS | ULSD | 43,512 |
| HESS | K-1 KERO | 30,020 |
| HESS | DYED KERO | 20,003 |
| CONOCO | ULSD | 289,688 |
| SUNOCO | ULSD | 23,004 |

| PRODUCT | TOTALS |
|---|---|
| #2 HEAT | 1,034,412 |
| ULSD | 1,104,145 |
| ULSD DYED | 12,710 |
| ULSD PREM | 135,955 |
| K-1 KERO | 30,020 |
| DYED KERO | 20,003 |
| | 2,337,245 |

### 1/1/2009 TO 12/31/2009

| TERMINAL | PRODUCT | GALLONS |
|---|---|---|
| CONSUMERS | #2 HEAT | 385,784 |
| DUCK ISLAND | #2 HEAT | 338,020 |
| DUCK ISLAND | ULSD | 287,741 |
| DUCK ISLAND | ULSD PREM | 57,914 |
| DUCK ISLAND | ULSD DYED | 6,974 |
| CONOCO | ULSD | 534,121 |
| SPRAGUE | #2 HEAT | 257,344 |
| SPRAGUE | ULSD | 466,209 |
| SPRAGUE | ULSD PREM | 18,762 |
| SPRAGUE | ULSD DYED | 3,518 |
| CONOCO | ULSD | 557,545 |
| HESS | ULSD | 8,503 |
| SUNOCO | ULSD | 63,009 |
| GULF | ULSD | 101,801 |
| HESS | K-1 KERO | 40,365 |
| HESS | DYED KERO | 6,359 |

| PRODUCT | TOTALS |
|---|---|
| #2 HEAT | 981,148 |
| ULSD | 2,018,929 |
| ULSD PREM | 76,676 |
| ULSD DYED | 10,492 |
| K-1 KERO | 40,365 |
| DYED KERO | 6,359 |
| | 3,133,969 |

### 1/1/2010 TO 12/31/2010

| TERMINAL | PRODUCT | GALLONS |
|---|---|---|
| CONSUMERS | #2 HEAT | 332,383 |
| DUCK ISLAND | #2 HEAT | 323,347 |
| DUCK ISLAND | ULSD | 452,637 |
| DUCK ISLAND | ULSD PREM. | 6500 |
| DUCK ISLAND | ULSD DYED | 13603 |
| SPRAGUE | #2 HEAT | 186,962 |
| SPRAGUE | ULSD | 252,088 |
| CONOCO | ULSD | 274,318 |
| CONECTIV | ULSD | 25,500 |
| GULF | ULSD | 118,859 |
| MOTIVA | ULSD | 2,500 |
| HESS | ULSD | 2,502 |
| PETROCOM | ULSD | 126,350 |
| HESS | K-1 KERO | 28,443 |
| SUNOCO | K-1 KERO | 1,400 |
| HESS | DYED KERO | 11,620 |
| VALERO | ULSD | 5,000 |

| PRODUCT | TOTALS |
|---|---|
| #2 HEAT | 842,692 |
| ULSD | 1,310,451 |
| ULSD PREM | 6500 |
| ULSD DYED | 25,223 |
| K-1 KERO | 29,843 |
| DYED KERO | 11,620 |
| | 2,226,329 |

KCM
1/31/12

SUNOCO          ULSD          50,697

**1/1/2011 TO 12/31/2011**

| TERMINAL | PRODUCT | GALLONS |
|---|---|---|
| DUCK ISLAND | #2 HEAT | 228,731 |
| DUCK ISLAND | ULSD | 461,994 |
| DUCK ISLAND | ULSD DYED | 24,402 |
| CONSUMERS | #2 HEAT | 245,778 |
| SPRAGUE | #2 HEAT | 235,065 |
| SPRAGUE | ULSD | 209,865 |
| SPRAGUE | ULSD DYED | 7,001 |
| CONOCO | ULSD | 139,176 |
| PETROCOM | ULSD | 294,034 |
| PETROCOM | ULSD DYED | 326 |
| HESS | ULSD | 17,001 |
| HESS | K-1 KERO | 14,036 |
| HESS | DYED KERO | 1,000 |
| SUNOCO | K-1 KERO | 19,673 |
| SUNOCO | DYED KERO | 8,222 |
| SUNOCO | ULSD | 24,052 |
| GULF | ULSD | 114,133 |

| PRODUCT | TOTALS |
|---|---|
| #2 HEAT | 709,574 |
| ULSD | 1,260,255 |
| ULSD PREM | |
| ULSD DYED | 31,729 |
| K-1 KERO | 33,709 |
| DYED KERO | 9,222 |
| | **2,044,489** |

# EXHIBIT E

## SELLER'S CERTIFICATE

Pursuant to the terms of Section 7.1 of those that certain Asset Purchase Agreement entered into among BUCKS COUNTY PETROLEUM LLC, CREIGHTON PROPERTIES FAMILY LIMITED PARTNERSHIP, TRENTON PETROLEUM, INC. GREENWOOD ENTERPRISES, INC., K. C. OIL, INC. JAN CREIGHTON, KIMBERLY CREIGHTON with their principal place of business at 1 Union Street, Suite 208, Robbinsville, NJ 08691, ("Seller"), and SYCAMORE ENERGY-K.C. OIL., LLC, a Pennsylvania limited liability company with its principal place of business at 630 Skippack Pike, Blue Bell, PA 19422, ("Buyer") dated as of November 14, 2011, as amended by the First Amendment to Asset Purchase Agreement dated December 22, 2011 and the Second Amendment to Asset Purchase Agreement dated January 30 2012 (the "Agreement"), the Seller hereby certifies that::

(a) The representations and warranties made by Seller in the Agreement are true in all material respects when made and on and as of the date hereof; and

(b) The Seller has performed and complied in all material respects with all provisions of the Agreement required to be performed or complied with by Seller before or at Closing.

Executed this _____ day of January, 2012

Bucks County Petroleum LLC

By:_____
    Jan Creighton, President

Creighton Properties Family Limited Partnership

By:_____
    Jan Creighton, General Partner

Greenwood Enterprises, Inc

By:_____
    Jan Creighton, President

K. C. Oil, Inc.

By:_____
    Jan Creighton, President

_____
Jan Creighton

_____
Kimberly Creighton